R–M INDUSTRIES, INC., Plaintiff,

v.

The UNITED STATES, Defendant.

Court No. 93–03–00184.
Slip Op. 94–49.

United States Court of
International Trade.

March 18, 1994.

Collier, Shannon, Rill & Scott, Michael J. Coursey, Kathleen W. Cannon and Mary T. Staley, Washington, DC, for plaintiff.

Lyn M. Schlitt, Gen. Counsel, James A. Toupin, Asst. Gen. Counsel, U.S. Intern. Trade Com'n, Anjali K. Singh, Washington, DC, for defendant.

### OPINION

RESTANI, Judge:

This matter is before the court on plaintiff's motion for judgment on the agency record, arguing that the United States International Trade Commission ("ITC" or "the Commission") erred in its negative material injury determination with respect to sulfanilic acid imports from the Republic of Hungary. *Sulfanilic Acid from the Republic of Hungary and India*, USITC Pub. 2603, Inv. Nos. 701–TA–318, 731–TA–560 and 561 (Feb. 1993) (final) (*"Final Det."*); 58 Fed.Reg. 11,-246 (Dep't Comm.1993).

### I.

### FACTS

A. *Background*

Plaintiff R–M Industries, Inc. ("R–M") is a U.S. manufacturer of technical grade sulfanilic acid and sodium sulfanilate. *Sulfanilic Acid from the Republic of Hungary and India*, USITC Pub. 2526, Inv. Nos. 701–TA–318, 731–TA–560 and 561 (June 1992) (preliminary), at 7. Sulfanilic acid is employed as a raw material in the production of optical brighteners, food colors, specialty dyes, and concrete additives. *Final Det.*, at I–27. Technical grade sulfanilic acid and sodium sulfanilate are both available in dry powder form. *See id.* at I–4. R–M was the sole domestic producer of sulfanilic acid during the period of investigation, thus the domestic industry was defined as consisting of R–M only. *Id.* at 8.

On May 7, 1992, R–M filed an antidumping duty petition with the United States International Trade Administration ("ITA") and ITC, alleging that sulfanilic acid imports from India and the Republic of Hungary were being or were likely to be sold in the United States at less than fair value ("LTFV"), and were causing or threatened to cause material injury to the U.S. industry.[1] 57 Fed.Reg. 23,378, 23,378 (Dep't Comm. 1992) (init. of antidumping duty investigations).[2]

ITC issued its preliminary determination on July 1, 1992, finding that there was a reasonable indication that imports from India threatened material injury to the U.S. industry, and imports from the Republic of Hungary had caused or threatened to cause material injury. 57 Fed.Reg. at 29,332. The products subject to the injury investigations included all grades of sulfanilic acid: refined sulfanilic acid, technical sulfanilic acid, and sodium sulfanilate. *Id.* at n. 3.

On February 24, 1993, ITC announced its final antidumping duty determination. ITC found that: a/ imports from Hungary did not cause or threaten material injury to the U.S. industry, and b/ imports from India sold at LTFV threatened material injury. 58 Fed. Reg. at 11,246. R–M contests the negative determination regarding injury from Hungarian imports.

B. *The Final Determination*

The Commission found the like product to be all forms of sulfanilic acid, including refined grade sulfanilic acid, technical grade sulfanilic acid and sodium sulfanilate. *Final Det.*, at 7. Refined grade sulfanilic acid and sodium sulfanilate can be used for the same end uses. *Id.; see Sulfanilic Acid from the People's Republic of China,* USITC Pub.

1. On the next day R–M filed a countervailing duty petition with ITA, alleging improper subsidies by the government of India. *Sulfanilic Acid from India,* 57 Fed.Reg. 23,384 (Dep't Comm. 1992) (init. of countervailing duty investigation).

2. R–M's antidumping petition against Hungary and India followed soon after its antidumping petition against the People's Republic of China, which was filed in October 1991. *Sulfanilic Acid from the People's Republic of China,* 56 Fed.Reg.

51,236, 51,236 (Dep't Comm.1991) (institut. & sched. of prelim. antidumping investigation). A final affirmative injury determination was issued on August 19, 1992. *Sulfanilic Acid from the People's Republic of China,* 57 Fed.Reg. 37,556 (Dep't Comm.1993) (finding threat of material injury caused by LTFV sales). The final injury investigation for Hungary and India commenced four months later, in November 1992. *Sulfanilic Acid from the Republic of Hungary and India,* 57 Fed.Reg. 54,420 (Dep't Comm.1992) (institut. & sched. of final antidumping duty investigations).

2542, Inv. No. 731–TA–538 (Aug. 1992) (final), at 7 n. 11. Technical grade sulfanilic acid is used for production of sodium sulfanilate, refined grade sulfanilic acid, specialty synthetic organic dyes, and concrete additives, and in certain cases shares the same end uses as other forms of sulfanilic acid. *Final Det.* at I–5, I–10; *Sulfanilic Acid from the PRC*, USITC Pub. 2542, at 7 n. 11.

The Commission noted that during the period of investigation, the rate of growth for domestic consumption of the refined forms of sulfanilic acid (refined grade sulfanilic acid and sodium sulfanilate) exceeded the growth rate for consumption of the technical grade. *Final Det.*, at 9. In 1989, R–M discontinued production of refined grade sulfanilic acid because of increased environmental costs resulting from purification of wastewater, and competition from low-priced imports of refined grade sulfanilic acid. *Id.* at 9–10. R–M later resumed production of refined grade in August 1992 following the Commission's affirmative determination for threat of material injury caused by sulfanilic acid imports from China. *Id.; Sulfanilic Acid from the People's Republic of China*, 57 Fed.Reg. 37,-556, 37,556 (Dep't Comm.1992).

It was against these conditions of competition that the Commission considered performance of the domestic industry. From 1989 to 1991, domestic consumption of sulfanilic acid increased in quantity and in value. *Final Det.*, at 10. The Commission found that between "interim 1991" (January to September) and "interim 1992" (January to September), consumption decreased in quantity and value. *Id.* Although U.S. production decreased from 1989 to 1990, it increased during 1990 and into 1991, and decreased in interim 1992 as compared with interim 1991. *Id.*

The Commission reviewed data indicating that the number of production workers was relatively stable but decreased during 1989 through interim 1992, and hours worked decreased steadily over the same period. *Id.* at 11. Productivity decreased from 1989 to

1990, but increased between 1990 and 1991, then decreased during interim 1992. *Id.* R–M's financial data indicated that net sales decreased from 1989 to 1990, increased in 1991, and decreased in interim 1992. *Id.* at 11–12. R–M reported operating losses for 1989 and 1990, but a positive operating income was reported for 1991. *Id.* at 12. Operating income in interim 1992 was less than operating income in interim 1991. *Id.* R–M's return on total assets increased from 1989 to 1991. *Id.*

Commissioner Rohr determined, based upon incorporation of the foregoing discussion of factors describing the condition of industry, that R–M was not experiencing material injury. *Id.* at 12 n. 46, 13.[3] Vice Chairman Watson and Commissioners Brunsdale and Crawford found no present material injury by reason of either Indian or Hungarian imports. *Id.* at 13, 25. Chairman Newquist, Vice Chairman Watson, and Commissioners Rohr and Nuzum all found that Indian imports of sulfanilic acid posed a threat of material injury. *Id.* at 13, 49.

In dissent, Chairman Newquist and Commissioner Nuzum found that imports from Hungary threatened material injury. *Id.* at 49. Also, in dissent, Commissioners Brunsdale and Crawford found that imports from India did not threaten material injury. *Id.* at 25. Plaintiff clarified at oral argument that it does not challenge any of the threat determinations. It challenges only the negative result with respect to present material injury by reason of Hungarian imports.

## II.

### Standard of Review

On a motion for judgment on the agency record, the scope of review of ITC's determination is whether it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988).

---

**3.** Commissioner Rohr's analysis did not reach the issue of impact of imports. Commissioner Rohr employed a "bifurcated" analysis to assess material injury, which consisted of reviewing performance indicators first, and upon which he made a negative finding on material injury, without reaching an analysis of the impact of imports.

### III.

### DISCUSSION

To determine whether material injury has occurred because of LTFV imports under investigation, ITC is required to consider the volume of imports, their effect on domestic prices and production, and other relevant factors. 19 U.S.C. § 1677(7) (1988 & Supp. IV 1992). To find whether threat of material injury caused by LTFV imports exists, ITC must review ten factors, including foreign production capacity, market penetration, price suppression or depression, inventories of subject merchandise, underutilized foreign production capacity, and actual or potential negative effects on the industry's existing development and production efforts. *Id.* § 1677(7)(F).

R–M argues that several errors in ITC's final negative present material injury determination by reason of ·Hungarian imports require that this matter be remanded. R–M contends that: 1/ Commissioner Rohr did not explain his determination; 2/ Vice Chairman Watson failed to cumulate imports from Hungary with imports from India; 3/ the Commission, insofar as it addressed the nexus of imports to present material injury, failed to cumulate imports from China; and 4/ Chairman Newquist and Commissioner Nuzum did not make a determination.

### A. *Commissioner Rohr's decision*

R–M contends that Commissioner Rohr's negative present material injury finding was not based on substantial evidence, because it does not relate the condition of the industry to the conclusion of no injury, and Commissioner Rohr's reasoning was not clearly discernible.

Commissioner Rohr's determination on present material injury adopted the detailed discussion of the mandatory statutory factors contained in the "Condition of the Industry" portion of the Commission's opinion. *Final*

*Det.,* at 8–12, 13. Commissioner Rohr further stated that he determined, "based on an analysis of the above factors, that the domestic industry is not currently experiencing material injury." *Id.* at 12 n. 46. Commissioner · Rohr noted ·that he relied on no single indicator, but rather his negative material injury determination was made on the basis of all indicators, and on the basis of the domestic industry's recent performance. *Id.* at 13.

■ R–M argues that Commissioner Rohr's reasoning is unclear because the Commission's statutory factor discussion includes certain economic indicators in interim 1992 that were in· decline as· compared with interim 1991, such as U.S. production, capacity utilization, employment and operating income. *Id.* at 10–12. Although there was evidence that during interim 1992 certain indicators had decreased, in comparison. to the 1991 improvements, operating income remained on the positive side. In August 1992 R–M resumed refined grade manufacture using equipment it had retained since production ceased in 1989. *Id.* at I–21. Furthermore, data for certain indicators were not available for the interim 1992 period. *Id.* at 12. As plaintiff concedes, a court cannot substitute its judgment for the agency's, nor reweigh the evidence. *Torrington Co. v. United States,* 790 F.Supp. 1161, 1169–70 (Ct.Int'l Trade 1992); *American Spring Wire Corp.· v. United States,* 8 CIT 20, 22, 590 F.Supp. 1273, 1276 (1984).[4] Nonetheless, ·we cannot discern exactly how Commissioner Rohr weighed the 1992 data on ·downward trends. We remand this matter for further explanation or reconsideration of Commissioner Rohr's view on the state of the industry.

### B. *Cumulation*

#### 1. *Imports from Hungary and India*

R–M assigns error to the negative present material injury determination of Vice Chair-

---

**4.** *But see Creswell Trading Co. v. United States,* 15 F.3d 1054, 1060 (Fed.Cir.1994) (placing the burden of proof upon Commerce to establish by a preponderance of the evidence the existence of statutory conditions precedent to the levy of countervailing duties). In the absence of a challenge by plaintiff on this ground in this negative injury case, the court will not reweigh evidence and will assume that ITC used the correct standard. It remains unclear how *Creswell* is to be applied in an investigation, as opposed to a purely adjudicative proceeding, and whether it will be applied so as to affect the bar on reweighing of evidence ·in certain cases.

man Watson, on the basis that he did not undertake a cumulative analysis of imports from Hungary and India. In partial response to this argument, the government has submitted a proposed revision to a portion of Vice Chairman Watson's opinion, as a clarification of his discussion of cumulation. R–M has opposed this submission, on the basis that a single commissioner should not be permitted to revise an error other than on remand to the Commission as a whole.

Cumulation of volume and effect of like product imports from two or more countries "subject to investigation" is mandated for the determination of present material injury. 19 U.S.C. § 1677(7)(C)(iv). An exception to the cumulation requirement is applicable where imports are found to be negligible. *Id.* § 1677(7)(C)(v).

Vice Chairman Watson's original opinion implies, though does not expressly state, that he employed cumulation in his analysis of present material injury. Vice Chairman Watson stated that "the domestic industry is not currently experiencing material injury by reason of the subject imports from Hungary and India based on a further evaluation of the record evidence." *Final Det.*, at 13 n. 2. In this same discussion Vice Chairman Watson determined that imports from India were not negligible, *id.*, according to the statutory exception carved out of the cumulation requirement for present material injury analysis. The proposed revision, however, implies that cumulation of Hungarian and Indian imports is a change from the prior opinion, stating that

> [t]he cumulation of Indian with Hungarian less than fair value imports does not substantially change this analysis.... Like the Hungarian imports, Indian imports were primarily refined grade sulfanilic acid, so that cumulation of Indian and Hungarian imports does not make their penetration significant in terms of impact on the domestic industry.

Def.'s Br. at 12–13 (citations omitted) (quoting proposed order).

R–M contends that, putting procedural deficiencies aside, the revision is flawed as improperly comparing imports from Hungary with those from India, rather than aggregat-

ing the subject imports to assess collective impact on the domestic industry. *See Chaparral Steel Co. v. United States*, 901 F.2d 1097, 1099 n. 2 (Fed.Cir.1990) (finding cumulation analysis requires aggregating data on volume and effect from two or more other countries).

R–M appears to misconstrue the revised opinion, as it is clear that Vice Chairman Watson combined Hungarian and Indian imports in his new analysis. Vice Chairman Watson finds in his revised view that both Indian and Hungarian imports were primarily refined grade, thus cumulation does not "make their penetration significant." This finding does not suggest merely a comparison of the data, but that in combination, the price and volume data for Hungarian and Indian imports do not establish material injury.

■ The issue thus becomes whether the court should grant the government's motion for leave for Vice Chairman Watson to amend his views, rather than requiring remand. It is proper for the court to consider permission to amend, as the court has jurisdiction over the action. *See Zenith Elecs. Corp. v. United States*, 12 CIT 932, 933–34, 699 F.Supp. 296, 297 (1988) (holding Commerce Department could not amend errors in results of a final determination while it was the subject of a court action without approval of the Court). Nonetheless, it is not the preferred procedure to amend determinations during briefing of challenges to the original determination. In any case, the court need not accept the amendment at this time. As the court determines that the Commission must provide further explanation of its views regarding Chinese imports, Vice Chairman Watson will also have the opportunity to clarify his views on cumulation of Indian and Hungarian imports, pursuant to ordinary procedures.

### 2. *Imports from China*

According to R–M, the Commission also failed in its present material injury analysis to cumulate unfairly traded imports from

China with Indian and Hungarian imports.[5] With the exception of two quarters in 1992, the antidumping investigation against imports from China overlapped with the investigation period for imports from Hungary and India.

ITC and R–M agree that although Congress defined an area of mandatory cumulation of unfairly traded imports for purposes of present material injury investigations,[6] it did not mean to preclude discretionary cumulation.[7] Commissioners Brunsdale and Crawford interpret the words "subject to investigation" in 19 U.S.C. § 1677(7)(C)(iv)(I) (mandatory cumulation in present injury cases) narrowly, so that once a negative injury determination is made or an order imposing duties is issued, they consider the investigation to be over. *See Final Det.*, at 27. Apparently, they then proceed to consider whether imports that are *not* "subject to investigation," but are subject to recent orders, continue to impact the industry and, thus, whether discretionary cumulation is warranted. *Id.* In this case Commissioners Brunsdale and Crawford found that Chinese imports did not cause present injury prior to issuance of the duty order and thus there was no impact by Chinese imports on "vote day." *See id.* at 27–28. The methodology resulting from this approach is not inconsistent with *Chaparral Steel*, wherein the court found that consideration of the entire overlapping periods of investigation was not required:

> We cannot say that the ITC was unreasonable in evaluating candidates for cumulation on the basis of their unfair trading or

the effects of proven unfair trading as of vote day.

901 F.2d at 1105 (footnote omitted). On the other hand, whether the Federal Circuit approved this exact interpretation of "subject to investigation" is not clear.

ITC's counsel expresses a different view of the meaning of the words "subject to investigation." Imports "subject to investigation" are said to *include* imports subject to a recent order, if the imports are impacting the domestic industry as of "vote day." Thus, according to this view cumulation becomes "mandatory" if the order is recent and the imports still impact the U.S. industry. ITC then states that if there is only a threat determination supporting the order, *ipso facto*, the imports have no impact on "vote day."

It may be that Vice Chairman Watson, the only person to reach this issue besides Commissioners Brunsdale and Crawford, is expressing this latter view. *See Final Det.*, at 13 n. 2. On the other hand, he may be adopting the view of Commissioners Brunsdale and ·Crawford as to the meaning of "subject to investigation." *USX Corp. v. United States*, 12 CIT 205, 682 F.Supp. 60 (1988), a cumulation case that was decided before the statutory provision requiring cumulation was enacted, does not prevent either mode of analysis. *Id.* at 218–19, 682 F.Supp. at 72–73. In *USX*, the court determined that ITC was not unreasonable in declining to cumulate imports from another investigation, where petitions were withdrawn or negative injury determinations were unchallenged. *Id.* at 220, 682 F.Supp. at 74.[8] Accordingly, the court cannot say

---

**5.** Although it does not challenge any threat determinations, R–M observes that Chairman Newquist and Commissioner Nuzum failed to cumulate imports from China with imports from Hungary and India in their analysis of threat of material injury. In their dissent, Chairman Newquist and Commissioner Nuzum determined that cumulation was inappropriate where a final order had been issued and eliminated any threat caused by Chinese imports, and there was no evidence that prior to issuance of the order significant inventories of Chinese imports had entered the United States. *Final Det.*, at 54–55.

**6.** Once duties are imposed the imports became "fairly traded."

**7.** Defendant-intervenor did not express a view on this issue. While legislative history may tend to support this view, it is not entirely clear to the court whether this interpretation is accurate. Congress statutorily defined an area of discretionary cumulation for threat investigations. 19 U.S.C. § 1677(7)(F)(iv). It did not do so for present injury determinations. *See* 19 U.S.C. § 1677(7)(C)(iv). Further explanation is required.

**8.** The court does not believe that two of the determinations cited by Commissioners Brunsdale and Crawford, *Gray Portland Cement and Cement Clinker from Japan,* USITC Pub. 2376, Inv. No. 731–TA–461 (Apr. 1991) (final), at 30, and *Certain Welded Carbon Steel Pipes and Tubes*

based on this record that cumulation with Chinese imports is required, prohibited or allowed. As there are at least two views extant, which may invoke different standards of review, the court requires more explanation from the Commission as to when it is acting in a discretionary area and when it believes cumulation is mandated. The court requires specific explanation of the term "subject to investigation" with regard to cumulation of imports from China.

## C. Analysis of substitutability and underselling

R–M also argues that Commissioners Brunsdale and Crawford improperly construed § 1677(7) to require a showing of lost sales to support an affirmative present material injury determination. Additionally, R–M claims that Commissioners Brunsdale and Crawford improperly ignored evidence of underselling.

R–M contends that the material injury analysis by Commissioners Brunsdale and Crawford seems to require a finding of lost sales to establish an affirmative injury determination, because the Commissioners stated that a finding of material injury could only be supported if prices of refined sulfanilic acid imports "induced purchasers to switch from the domestic technical grade or [sodium sulfanilate] to the refined grade." *Final Det.,* at 31–32.

Rather, Commissioners Brunsdale and Crawford emphasized the importance of substitutability in their material injury analysis, and the statement at issue is relevant to substitutability.[9]

*from Taiwan,* USITC Pub.1994, Inv. No. 731–TA–349 (July 1987) (final), at 20, greatly clarify this matter.

**9.** Analysis of substitutability varies according to the context of its application. For the purposes of defining "like product" as described in 19 U.S.C. § 1677(10) (1988), it is not necessary that like products be completely substitutable, only that the like product be "like, or in the absence of like, most similar in characteristics and uses." *Id.* For purposes of cumulation, the analysis of substitutability is also not stringent, as only a "reasonable overlap" in competition is required where like product imports "compete with each other and with like products of the domestic

Findings by ITC that factor substitutability into impact of imports on domestic producers have been upheld previously. *See Feldspar Corp. v. United States,* 825 F.Supp. 1095, 1100 (Ct.Int'l Trade 1993) (holding non-substitutability and minor price differences not to be incentive to shift sources); *General Motors Corp. v. United States,* 827 F.Supp. 774, 786 (Ct.Int'l Trade 1993) (upholding finding that price was unlikely to determine product choice because products had limited substitutability). These cases do not require proof of lost sales to establish an affirmative injury determination, and Commissioners Brunsdale and Crawford do not say that they do.

Commissioners Brunsdale and Crawford properly included in their views an analysis of the statutory factors under § 1677(7). *Final Det.,* at 38–43. As part of their analysis of "other economic factors," 19 U.S.C. § 1677(7)(B)(ii), they considered substitutability. Commissioners Brunsdale and Crawford observed that greater substitutability between imports and the domestic like product produces greater volume effects, price effects and impact on the industry, while limited substitutability produces smaller effects. *Final Det.,* at 34. The Commissioners found that increasing volumes of the subject imports did not have a significant effect on the domestic industry, in part because of limited substitutability of sodium sulfanilate with refined grade sulfanilic acid.[10] *See id.* at 37–38. They also found that Food and Drug Administration regulations had created a preference for refined grade sulfanilic acid among some buyers. *Id.* at 32.

industry." 19 U.S.C. § 1677(7)(C)(iv), (F)(iv); *see United Eng'g & Forging v. United States,* 15 CIT 561, 582, 779 F.Supp. 1375, 1393 (1991). In analysis of material injury, substitutability is one factor in the evaluation of volume and price. *See Feldspar Corp. v. United States,* 825 F.Supp. 1095, 1100 (Ct.Int'l Trade 1993); *General Motors Corp. v. United States,* 827 F.Supp. 774, 787–88 (Ct.Int'l Trade 1993).

**10.** Commissioners Brunsdale and Crawford found that the limited substitutability resulted from a purchaser's quality requirements for its end products, and from reduced efficiency and increased costs associated with switching between grades. *Final Det.,* at 35–38.

In their discussion of other economic factors, Commissioners Brunsdale and Crawford also noted that some time after R–M ceased production of refined sulfanilic acid in 1989, Japan severely limited its exports to the U.S. between 1990 and 1991. *Id.* at 33. Purchasers turned primarily to imports from China. *Id.* Once the investigation of Chinese imports began, final dumping margins were uncertain in 1992 and preliminary duties were 85.29 percent, thus customers turned to the subject imports. *Id.* As a result, subject imports were found to fill the gap in the market left by Japan, and did not displace domestic sales. *Id.* at 33–34.

As to the volume effect of imports on the domestic industry, Commissioners Brunsdale and Crawford determined that R–M's market share would not likely increase if the subject imports were absent from the market, because fairly traded refined grade sulfanilic acid from China was available at lower prices than the domestic refined grade. *Id.* at 38–40. The Commissioners noted a large increase in imports, but they found that the significance of the increase was "tempered" by the presence of fairly traded imports, and that R–M's market share had also increased. *Id.* at 38. This analysis took into account that increasing volumes of the Hungarian and Indian imports might have a significant effect on the domestic industry, depending on substitutability. As indicated, however, the Commissioners concluded that R–M's market share was not affected to a large degree by these imports because of limited substitutability.[11] *Id.* at 40.

■ Substitutability was also germane to the Commissioners' analysis of price effects. It is true that a finding of price underselling is not required to support an affirmative determination. *Cemex, S.A. v. United States,* 790 F.Supp. 290, 298 (Ct.Int'l Trade 1992) (holding that showing of suppressive prices may be sufficient to support injury finding). Section 1677(7)(C)(ii) permits a finding of injury where an imported product of higher quality may not be directly substi-

tutable but nonetheless causes price depression or suppression for the lower cost domestic product. *See* 19 U.S.C. § 1677(7)(C)(ii).

Here, Commissioners Brunsdale and Crawford found that price comparisons were largely irrelevant, as the only refined grade comparisons were for 1989, and only one comparison was available for technical grade. *Id.* at 40–41. Further, they determined that absolute price comparisons that did not factor non-price differences between imported and domestic products were not useful, particularly because factors such as substitutability motivated the purchase decision. *Id.* at 41. Commissioners Brunsdale and Crawford concluded, largely as a result of this limited substitutability, that there was no significant price underselling, or price depression or price suppression. *Id.*

Thus, Commissioners Brunsdale and Crawford did not ignore evidence of underselling, as argued by plaintiff. They determined after review that they were not relying upon this data, because the price comparison data for refined grade and for technical grade was limited. *Id.* at 40–41. The Commissioners considered the evidence of underselling and found it not to be useful for acceptable reasons. The statute does not require more. *See* 19 U.S.C. § 1677(7)(B); *Cemex,* 790 F.Supp. at 298–99.

■ It is clear that Commissioners Brunsdale and Crawford did not require a finding of lost sales to establish present material injury. Further, the Commissioners articulated their rationale for not relying upon certain price data, and their decision in this regard was not unreasonable and was supported by substantial evidence.

### D. *Chairman Newquist's and Commissioner Nuzum's decision*

■ R–M alleges lastly that Chairman Newquist and Commissioner Nuzum, in their partial dissent, were required to reach the issue of present material injury, as well as the issue of threat of material injury. R–M relies on the language of the statute for this

11. This type of analysis of substitutability has been applied previously, and requires no specific finding as to lost sales. *See, e.g., General Motors,* 827 F.Supp. at 787–88 (upholding *Minivans from Japan,* USITC Pub. 2529, Inv. No. 731–TA–522 (July 1992) (final), at 36 (finding on significance of volume increases made in view of non-price factors such as substitutability)).

argument. R–M further contends that because a present material injury determination and a threat of material injury determination would have different implications on the assessment of duties, the Commissioners are required to make a separate finding on each issue.

As provided in 19 U.S.C. § 1671d(b)(1), ITC is required to make a final determination of whether:

(A) an industry in the United States—

  (i) is materially injured, or

  (ii) is threatened with material injury, or

(B) the establishment of an industry in the United States is materially retarded.

19 U.S.C. § 1671d(b)(1) (1988). ITC relies on the use of the word "or," to argue that ITC may reach an affirmative decision on any ground without considering alternative grounds. It is clear, however, that the statute cannot be rewritten simply by substituting the word "and" each time the word "or" appears.

It is quite possible that an injured industry is not threatened with harm beyond its current condition. Likewise, a threatened industry may also be suffering current injury. Most importantly, the remedies for current injury are not concomitant with those required by a simple finding of threat. They are, in fact, more extensive. In a case of threat of material injury, additional duties are assessed only on imports entered subsequent to the order.[12] In a present injury case, all entries suspended prior to the order are liquidated with additional duties to offset the unfair trade advantage calculated by ITC. 19 U.S.C. § 1673e(b)(1) (1988). Thus, even if the plain words of the statute are susceptible of more than one meaning, the structure of the statute clearly requires a finding as to present injury. Accordingly, Chairman Newquist and Commissioner Nuzum are required to state their views on present material injury.

 ITC's argument that this issue is moot for this case is of no moment. The issue must be addressed as it likely will continually evade review. *See, e.g., Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 546, 96 S.Ct. 2791, 2796–97, 49 L.Ed.2d 683 (1976) (quoting *Southern Pac. Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911) (finding exception to mootness where underlying dispute is capable of repetition but evades review)); *Associacao Dos Industriais de Cordoaria e Redes v. United States,* 828 F.Supp. 978, 984 (Ct.Int'l Trade 1993) (same). Lack of a finding of present injury presumptively precludes a finding of irreparable harm. *See Sandoz Chems. Corp. v. United States,* Slip Op. 93–188, at 7, 1993 WL 377750 (Sept. 23, 1993) (finding no irreparable harm in connection with motion for injunction of liquidation after negative material injury determination). Thus, in a "threat only" case, court injunction of liquidation of suspended (i.e. pre-injury) entries likely would not occur. The entries would then be liquidated in due course, continually mooting the issue.

### IV.

#### Conclusion

The Commission shall reconsider its view on the meaning of "subject to investigation" and discretionary cumulation with regard to imports from China. Commissioner Rohr shall reconsider his view on the state of the industry. Vice Chairman Watson shall also reconsider his view on cumulation of Indian and Hungarian imports. Chairman Newquist and Commissioner Nuzum shall consider the issue of present material injury. Remand results are due in forty-five days. Objections are due twenty days thereafter, and responses ten days thereafter.

**SO ORDERED.**

---

12. In a threat case, an additional finding of harm, but for suspension of liquidation, will result in retroactive imposition of duties on suspended entries. 19 U.S.C. §§ 1673d(b)(4)(B), 1673e(b)(2) (1988).