**Slip Op. 01-102**

# UNITED STATES COURT OF INTERNATIONAL TRADE

—————————————————————————— :
                                                      :
FAR EASTERN TEXTILE LTD.,                              :
                                                      :
      Plaintiff,          :
                                                      :
      v.                  :
                                                      :
                                                      :  Court No. 00-06-00296
THE UNITED STATES INTERNATIONAL                       :
TRADE COMMISSION,                                     :    **Public**
                                                      :    **Version**
      Defendant,           :
                                                      :
      and                 :
                                                      :
ARTEVA SPECIALTIES S.a.r.l.,                          :
d/b/a KoSa, and WELLMAN, INC.,                        :
                                                      :
      Defendant-Intervenors. :
—————————————————————————— :

[ITC's determination of material injury sustained.]

Dated: August 14, 2001

White & Case, LLP (William J. Clinton; Lyle B. Vander Schaaf; Frank H. Morgan) for plaintiff.

Marc A. Bernstein, Acting Assistant General Counsel, Lyn M. Schlitt, Office of General Counsel, United States International Trade Commission, of counsel, (Mary Jane Alves), for defendant.

Collier Shannon Scott, PLLC (Paul C. Rosenthal, Kathleen W. Cannon, David C. Smith, Jr., and Grace W. Kim) for defendant-intervenor.

**OPINION**

**RESTANI, Judge:**

Far Eastern Textile Ltd. ("Far Eastern"), respondent in the underlying investigation, moves for judgment on the agency record pursuant to USCIT Rule 56.2. At issue is the final determination of the International Trade Commission (the "Commission") in Certain Polyester Staple Fiber from Korea and Taiwan, USITC Pub. 3300, Inv. Nos. 731-TA-825 to 826 (final) (May 2000), List 2, C.R. Doc. 224 [hereinafter "Final Determination"]. Far Eastern contests the Commission's affirmative material injury determination by arguing that its finding of substantial competition between the foreign imports and the domestic like product (1) is based on data that was misreported by petitioners and (2) is not supported by substantial evidence given dissimilarities among the types of polyester staple fiber ("PSF"). Far Eastern also contests the Commission's determination of price depression.

## JURISDICTION & STANDARD OF REVIEW

This Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (1994). The Court will uphold the Commission's determination in antidumping investigations unless it is "unsupported by substantial evidence in the administrative record or is otherwise not in accordance with law." 19 U.S.C. § 1516a(a)(2)(B)(i).

## FACTUAL & PROCEDURAL BACKGROUND

On April 2, 1999, E.I. DuPont de Nemours; Arteva Specialties S.a.r.l., d/b/a KoSa ("KoSa"); Nan Ya Plastics Corp., America ("Nan Ya")[1]; Wellman, Inc.; and Intercontinental Polymers, Inc., filed a petition with the Commission and the Department of Commerce ("Commerce") alleging that imports of PSF from the Republic of Korea and Taiwan are being, or are likely to be, sold in the United States at less than fair value ("LTFV"), and that such imports are both materially injuring and threatening further material injury to an industry in the United States. See Certain Polyester Staple Fiber From the Republic of Korea and Taiwan, 64 Fed. Reg. 23,053 (Dep't Comm. 1999) (init. antidumping invest.).[2]

_____

[1] Nan Ya Plastics was not a petitioner in the investigation involving Taiwan. In a letter dated May 4, 1999, Nan Ya Plastics also withdrew as a petitioner in the investigation involving Korea. In the same letter, DuPont withdrew as a petitioner in the investigation involving Taiwan. See Certain Polyester Staple Fiber from Korea and Taiwan, USITC Pub. 3197, Inv. Nos. 731-TA-825 to 826 (prelim.) (May 1999), List 1, P.R. Doc. 61, at 1 n.2 [hereinafter "Preliminary Determination"].

[2] In the April 29, 1999 notice of initiation, Commerce's definition of the scope of the investigation reads in relevant part as follows:

> Certain polyester staple fiber is defined as synthetic staple fibers, not carded, combed or otherwise processed for spinning, of polyesters measuring 3.3 decitex (3 denier, inclusive) or more in diameter. This merchandise is cut-to-lengths varying from one inch (25 mm) to five inches (127 mm). The merchandise . . . may be coated, usually with a silicon or other finish, or not coated. Certain polyester staple fiber is generally used as stuffing in sleeping bags, mattresses, ski jackets, comforters, cushions, pillows, and furniture.

The Commission instituted investigations effective the same date.

In May of 1999, the Commission preliminarily determined that an industry in the United States is "materially injured" by reason of less-than-fair-value imports of PSF from Korea and Taiwan. Preliminary Determination at 1.  The Commission had considered whether certain types of PSF, specifically "low-melt fiber,"[3] "conjugate fiber,"[4] "fiber made from recycled materials," and so-called "regen" fiber,[5] should be defined as separate like products.  Id. at 5-11.  The Commission found that there was one domestic like product coextensive with the scope of

_____

64 Fed. Reg. at 23,053.

[3] "Low-melt" fiber is described as follows:

a bicomponent fiber comprised of a polyester core and a sheath of copolymer polyester.  Low melt is used to bind conventional polyester staple fibers together to form a nonwoven batt suitable for bulk uses such as furniture stuffing.  When heated, the outer copolymer sheath melts at a lower temperature than its core or conventional polyester staple fibers, and the melted sheath acts as a glue, holding the polyester staple fibers together.

Preliminary Determination at 6.

[4] "Conjugate" fiber is described as follows:

a bicomponent fiber, with two polyesters used to create a curled, or spiraled fiber.  This spiral shape provides characteristics to the conjugate fiber similar to those that mechanical crimping gives to conventional polyester staple fiber.

Preliminary Determination at 7-8.

[5] "Regen" fiber is described in detail in the discussion section.

the investigations defined by Commerce, but indicated that it would revisit the issue in the final phase of the investigation. Id. at 11.

On October 22, 1999, the Commission solicited comments from the parties on the draft producer, importer, purchaser, and foreign producer questionnaires. In its May 15, 2000 final determination, the Commission determined that two separate domestic like products exist for merchandise covered by Commerce's investigation, namely: (1) low-melt PSF and (2) all other types of PSF not specifically excluded (collectively designated "conventional PSF"). Final Determination at 3, 12. The Commission majority found low-melt fiber to be a domestic like product separate from the other polyester staple fibers, and issued negative material injury and threat determinations with respect to the domestic industry producing low-melt PSF. Final Determination at 6-9, 28-36.[6]

With respect to "conventional" fiber, however, the Commission issued an affirmative material injury determination. Final Determination at 16-28. The Commission noted that for the purposes of the final phase of the investigation, "respondents no longer argue that regenerated fiber is a separate domestic like

---

[6] Accordingly, the scope of the antidumping duty orders was revised from that used in the investigations to exclude low-melt PSF. See Certain Polyester Staple Fiber from Korea and Taiwan, 65 Fed. Reg. 33,807 (Dep't of Comm May 25, 2000) (amd'd final determ.).

product."  Final Determination at 5 n.13.  See also Letter from

Stein Fibers, Ltd. to Commission (Feb. 8, 2000), List 2, C.R.

Doc. 46.

On May 25, 2000, Commerce published its antidumping duty

order pursuant to the affirmative final determinations made by

Commerce and the ITC.  Certain Polyester Staple Fiber from

Taiwan, 65 Fed. Reg. 33,807 (Dep't Comm. 2000).  Far Eastern

appeals the Commission's final determinations of material

injury.[7]

## Discussion

## I. Material Injury Analysis

Under 19 U.S.C. § 1673d(b)(1), the Commission is charged

with making "a final determination of whether . . . an industry

in the United States (i) is materially injured, or (ii) is

threatened with material injury . . . by reason of imports, or

sales . . . for importation, of the [subject] merchandise."

Section 1677(7)(B)(i) specifies that the Commission in making its

final material injury determination must consider the volume of

the subject imports, their effect on prices for the domestic like

product, as well as their impact on domestic producers of the

domestic like product.[8]  Pursuant to 19 U.S.C. § 1677(7)(B)(ii),

---

[7] Far Eastern does not on appeal dispute the Commission's
domestic like product determination.

[8] Before engaging in this analysis, however, the Commission
must "cumulatively assess the volume and effect of imports of the

the Commission may also "consider such other economic factors as are relevant to the determination."  No single factor, however, is determinative and the Commission evaluates all relevant economic factors "within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C).

Far Eastern contests the Commission's affirmative material injury determination by arguing that its general conclusion that foreign imports compete with the domestic like product (1) was based on "flawed" data regarding "regenerated fiber" and (2) was not supported by substantial evidence.  Far Eastern also contests the Commission's finding that underselling by subject imports contributed to price depression.

## A.  Reliance on Questionnaire Responses

Far Eastern argues that the Commission unreasonably relied on "flawed" data reported by the domestic producers regarding their shipments of "regenerated fiber."[9]  Far Eastern's

---

subject merchandise from all countries with respect to which ... petitions were filed . . . on the same day . . . if such imports compete with each other and with domestic like products in the United States market."  19 U.S.C. § 1677(7)(G)(i).  Far Eastern does not directly challenge cumulation of data on the foreign imports.  Rather, it challenges the Commission's finding that foreign imports compete with the domestic like product insofar as the finding underlies the ultimate material injury determination.

[9] Far Eastern also challenges the <u>Final Determination</u> on the ground that data reported by [      ] was found to have errors.

contention that the data is "flawed" rests on the proposition
that petitioners ignored part of the definition given by the
Commission and reported as "regenerated fiber" what
"admittedly"[10] should have been classified as "residual PSF."[11]
This alleged misreporting, Far Eastern concludes, resulted in
distorted volume levels and skewed pricing comparisons that
formed the basis for the Commission's conclusion that there was
substantial competition between the subject imports and the
domestic like product.  Far Eastern Br. at 11.  Far Eastern's
arguments lack merit.

    Far Eastern misconstrues the Commission's definition of
"regenerated PSF."  The category "regenerated fiber" was defined

---

The Commission noted in the Final Determination, however, that
the errors were corrected pursuant to verification.  Final
Determination at 28, n.123; Verification Report (April 18, 2000)
List 2, C.R. Doc. 232.  Verifiable data were incorporated in the
final staff report.  Memorandum INV-X-087, List 2, C.R. Doc. 38,
at VI-1 [hereinafter "Final Report"].  Data that were ultimately
unverifiable were clearly distinguished in the Final Report.  See
Final Report at VI-11 to 13.  In light of such clear
distinctions, the court cannot accept Far Eastern's contention
that the Commission disregarded accurate figures in favor of data
known to be unverifiable.

    [10] Far Eastern cites and the record reveals no evidence that
the domestic industry "admitted" that the product it reported in
the regenerated fiber category did not in fact meet the
Commission's definition of this term.

    [11] The designation "residual" PSF does not refer to a
category defined in the questionnaires.  Rather, "residual" PSF
refers to what the Commission in the Final Determination labeled
any conventional PSF (i.e., certain PSF excluding "low-melt"
fiber) that did not satisfy the definition for either regenerated
or conjugate fiber.

in the Commission's instruction booklet as follows:

> polyester staple fiber produced primarily from waste
> polyester fibers but may also include other polyester
> waste products such as non-fiber polyester solids.  It
> generally has inconsistent physical properties, such as
> irregular color, denier, staple length, and crimp
> court.  It is generally sold without specifications,
> guarantees, or warranties of any kind.

General Information, Instructions and Definitions for Commission
Questionnaires, Inv. Nos. 731-TA-825 to 826 (final) at 4, Far
Eastern Reply App., Tab 1, at 7 [hereinafter "Instructions"].
First, by its terms, the first sentence provides the only
*absolute* requirement to meet the definition.   Thus, producers
were to report as "regenerated fiber" any PSF that primarily had
been regenerated from waste polyester staple fiber itself or
primarily was made from non-fiber (i.e., recycled) materials.[12]
The evidence supports the finding that domestic producers did in
fact manufacture PSF produced primarily from waste polyester
fibers or other polyester waste products during the POI, and

---

[12] The <u>Final Report</u> clarified that certain PSF can be
classified according to raw materials as follows:

> Staple fiber may be made from reacting ethylene glycol
> and either terephthalic acid or its methyl ester; if so
> produced, it is termed virgin PSF.  Staple fiber may
> also be made from recycled polyester, using either
> consumer waste, such as polyethylene terephthalate
> (PET) bottles, or industrial waste, such as polyester
> chips or spun tow; such fiber is known as regenerated,
> or recycled fiber.

<u>Final Report</u> at I-4.

accurately reported this data to the Commission.[13]  See Letter to
Jozlyn Kalchthaler from Petitioners, April 11, 2000, KoSa's App.,
Tab 6.

Second, Far Eastern ignores the use of the qualifier
"generally" with respect to the latter parts of the definition.
There is no support for the proposition that, in drafting
definitions, the Commission is prohibited from including
descriptive terms that indicate factors to be considered in
completing the questionnaire.  The use of qualifiers indicates
that although the attributes that follow (e.g., inconsistent
physical properties, irregular color) factor into whether a
particular product can be deemed to fall within the definition,
the lack of such an attribute would not necessarily eliminate a
product from the category.  This is not to say that the latter
part of the definition is meaningless and can be ignored.
Rather, it shows that for the purposes of the questionnaire, the
category "regenerated PSF" was intended to encompass what had

---

[13] The Final Report stated that "[p]etitioners manufacture
PSF from polyester waste material, including tow waste, scraps,
filaments, polyester film, and PET bottles."  Final Report at I-
12 & n.35.  The Final Report specified that [




]."  Id.  Far Eastern does not dispute these findings.

been referred to in the preliminary determination as U.S. produced "recycled fiber" and Korean "regen."

Far Eastern's "flawed data" argument is essentially a belated attempt to convince the Commission that a separate category for "recycled PSF" should have been included in the questionnaire. In the preliminary phase of the investigations, the Commission had analyzed product distinctions in four categories: "low-melt PSF," "conjugate PSF," "PSF made from recycled materials" and "regen PSF."[14] The distinction between the latter two categories derived from an acknowledged difference in inputs, rather than any inherent difference in physical composition, end-uses, or any other factor used in determining like product.[15]

Several respondents, *not including Far Eastern*, proposed definitions of "regenerated fiber," "low-melt fiber," and

---

[14] The category "regen" was described in the Preliminary Determination as follows:

> Regen is made exclusively from recycled or regenerated materials, but is chemically identical to conventional polyester staple fiber. Asian producers of regen tend to be small firms, generally using inferior quality equipment. The resulting regen polyester staple fiber tends to be of a lower quality than conventional fiber; regen has uneven coloration and inconsistent sizing and may contain large chips of unprocessed polyester.

Preliminary Determination at 10.

[15] Thus, conjugate fiber can be produced from regenerated fiber or non-regenerated fiber. See Final Results at 22 n.88.

"conjugate fiber" to be included with the questionnaires.  One

respondent specifically proposed that, for the purposes of the

questionnaire, "regenerated fiber" be distinguished from

"recycled fiber," which it described as a PSF "comparable in

quality and interchangeable with virgin polyester staple fiber

but using as its raw material recycled products made from

polyethylene terephthalatate ("PET") such as soda bottles instead

of newly manufactured PET chip."   Commission App., List 1, P.R.

Doc. 80, at 3.  The proposed definition for "regenerated PSF" was

as follows:

> certain polyester staple fiber . . . produced primarily
> from waste polyester fibers, or other polyester waste
> product.  It is typically off color, and may consist in
> part of non-fiber polyester solids such as unprocessed
> pieces of the waste feedstock.  It is generally sold
> without specifications, guarantees, or warranties of
> any kind.

Id.

In a letter dated November 1, 1999, petitioners disputed the

grounds for the proposed distinction, arguing, *inter alia,* that

inputs used to create "recycled" and "regenerated" fibers can be

and are in fact combined to produce a single resulting fiber.

Commission App., List 1, P.R. Doc. 88, at 4-5.  The questionnaire

ultimately adopted a definition of regenerated fiber that was

similar to that proposed by respondents, but rejected "recycled

fiber" as a separate category.  See Instructions, at 4, Far

Eastern Reply App., Tab 1, at 7.  Such a grouping of markets

segments is proper.   See Makita Corp. v. United States, 974 F.

Supp. 770, 788 (Ct. Int'l Trade 1997) ("[N]either the statute nor

its legislative history requires the Commission to adopt a

particular analysis when the market has segments.") (citation

omitted).   See also BIC Corp. v. United States, 21 CIT 448, 453,

964 F. Supp. 391, 397 (1997)("[W]hen it has reviewed

determinations in which the Commission has considered using

market segments, the court has deferred to the Commission's

findings regarding the existence and importance of such

segments.") (citing Acciai Speciali Terni, S.p.A. v. United

States, 19 CIT 1051 (1995)).   Thus, the single category

"regenerated PSF" with broad descriptive terms was apparently

intended to include what had been referred to as "regen" and

"recycled fiber" to account for the lack of a clear dividing line

given the practice of blending the two types of fibers. Far

Eastern may not now obtain remand on the ground that the

Commission was wrong in not fully accepting a co-respondent's

arguments.   If Far Eastern had more persuasive arguments, it

could have made them at the appropriate time, but elected not to

do so.

In fact, the record shows that Far Eastern did not always

distinguish between PSF made from recycled material and PSF made

from PSF waste.   In the Commission's January, 2000 sales

verification at Far Eastern's corporate headquarters, company

officials represented that "[Far Eastern] does not differentiate
in the ordinary course of business between regenerated and
recycled inputs.  Rather, they refer to all non-virgin inputs as
'waste.'"  Far Eastern Sales Verification Report (Feb. 11, 2000),
at 11, Commission App., List 2, C.R. Doc. 16, Exh. 2, at 2.  In
its appeal, Far Eastern does not dispute that such
representations were made to the Commission.  The Commission
properly relied on data that had been derived from reporting
according to definitions consistent with these representations.


**B.  Substitutability**

    The Commission's affirmative material injury determination
with respect to "conventional fiber" was based in part on a
threshold finding that "conjugate fiber and regenerated fiber
compete to a substantial degree with all other conventional PSF
([designated] 'residual PSF') in the U.S. conventional PSF
market."  Final Determination at 19.  See BIC, 964 F. Supp. at
398 ("In analysis of material injury, substitutability is one
factor in the evaluation of volume and price.") (citation
omitted).  Far Eastern contends that the underlying finding of
fungibility was not based on substantial evidence.

    The Commission first acknowledged that "conjugate and
regenerated fiber may substitute for non-PSF products [such as
goose-down for "conjugate," and foam and shoddy (i.e., reclaimed

wool) for "regenerated fiber"] to some extent."  <u>Final</u>

<u>Determination</u> at 21-22.  The Commission nonetheless made three

findings to conclude that there was "a large degree of

fungibility and direct competition between both of the types of

imported fiber [i.e., "conjugate PSF" and "regenerated PSF"] and

domestically produced PSF."  <u>Id.</u> at 22.[16]  These findings related

to the following product and industry characteristics:  (1)

blending among types of conventional PSF; (2) product end-use;

and (3) interchangeability of conjugate fiber and regenerated

fiber with other certain PSF.


## 1.  Blending

The Commission's fungibility determination was based in part

on a finding that "purchasers' blending practices indicate that

there are different mixtures of PSF that will result in the

desired end-product."  <u>Final Determination</u> at 22.  The Commission

reasoned as follows:

Purchasers appear to be able to shift their blends to

---

[16] To the extent the Commission relies on substitutability
in its material injury determination, the products in question
need not be *direct substitutes*, but they must be substantially --
rather than theoretically -- substitutable.  <u>See</u> <u>R-M Indus., Inc.</u>
<u>v. United States</u>, 18 CIT, 219, 226 n.9, 848 F. Supp. 204, 210
n.9, 211 (1994) (noting differences among contexts in which
substitutability arises and holding that "[s]ection
1677(7)(C)(ii) permits a finding of injury where an imported
product of higher quality may not be directly substitutable but
nonetheless causes price depression or suppression for the lower
cost domestic product").

take account of differences among the types of
conventional PSF.  For example, purchasers may use
greater quantities of lower-priced regenerated fiber
and lesser quantities of other types of fiber to
achieve a low price point.  However, in such
situations, it is price concerns that drive the
blending decision.

Id. at 22.  Far Eastern concedes that purchasers may blend

different types of PSF in different proportions.  Far Eastern

maintains, however, that blending occurs because the different

types of PSF "complement" rather than displace one another, as a

result of marked quality differences among the types.[17]  Although

different proportions of types of PSF render the blend suitable

for different *grades* of applications (e.g., high-end furniture

vs. low-end furniture), this does not negate the fact that, as

the record shows, purchasers attempt to reach a lower price-point

on a product by substituting one type for another.[18]  Final

Report at II-11, 14-15.  That the types are used in varying

---

[17] Rather than cite to specific record evidence to support
its theory that the types of PSF complement each other, Far
Eastern relies on analogy.  Because blending is according to
specific formulae, Far Eastern likens the types of PSF to
different ingredients in making a cake, i.e. flour and sugar.
This analogy necessarily fails because although the different
types of PSF have varying levels of quality, they provide
essentially the same ultimate function, e.g., filler, unlike
different ingredients in a recipe.

[18] For example, Patrick J. Magrath, one of petitioners'
economic consultants, testified that "[t]here is pressure from
[purchasers'] end-users to hit certain price points, but it's
also for them to lower their costs and maintain their profit
margins, so [blending is] driven by that. . . ."  Final Hearing
Transcript (Mar. 28, 2000), List 1, P.R. Doc. 251, Far Eastern
App., Tab 2, at 65.

proportions supports the conclusion that the types are substitutes to a certain degree rather than complements. Because a purchaser may change the proportion of PSF types in order to meet a certain price point and still satisfies a demand for a particular end-use, the Commission's finding of competition on this ground is supported by substantial evidence. See Mukand Ltd. v. United States, 20 CIT 903, 904, 937 F. Supp. 910, 912-13 (1996) (finding of competition supported by substantial evidence where low-priced subject merchandise is used in place of domestic like product for applications in which quality is not critical).

### 2. End-use

The Commission found that

> respondents have failed to identify a significant market segment or end-use served by regenerated fiber or conjugate fiber that is not served by residual PSF. The large volume of imports of conjugate fiber and regenerated fiber indicates that they are not serving niche markets, but rather are competing to a large degree with residual PSF.

Final Determination at 22.  Although it is questionable whether the Commission can determine solely from volume figures whether a product serves a niche market or not, the Commission's finding regarding competition on the ground of similar end-use is supported by substantial evidence.  The Final Report states that "PSF is principally used as fiberfill and is seldom visible. . . . The majority of the subject fiber is used as stuffing in

sleeping bags, mattresses, ski jackets, comforters, cushions, pillows, and furniture.  PSF used for fill is produced in many variations for purposes of quality enhancement." Final Report at I-3.  See also id. at I-7 (conjugate fiber end uses) and I-11 to 12 (regenerated fiber end uses).  Far Eastern does not dispute that all types of conventional PSF (i.e., certain PSF excluding "low melt PSF," which was found to serve primarily as a bonding agent) are used as fiberfill, nor is there any testimony to the contrary.  Rather, Far Eastern asserts that the different types of PSF correspond to different *quality levels* of end-uses.  The record supports Far Eastern's statement that, in contrast to regenerated fiber, conjugate fiber is generally "a technologically advanced product suitable for high-end uses, with better filling power and shape retention."  Final Determination at 10; Final Report at I-7, II-5 to 8. The varying degrees of quality within certain types of end-uses, however, does not render unsupported by substantial evidence the Commission's conclusion that all conventional PSF is used for the similar purposes described in the Final Report.

### 3. Interchangeability

The Commission relied on pricing data and questionnaire responses to make an underlying finding of interchangeability between subject imports of conventional PSF and the domestic like

product.  Final Determination at 22-23.  Far Eastern disputes
this finding, arguing that "the evidence does not support, and
often contradicts, the Commission's finding that subject imported
conjugate and regenerated fiber are substitutable and compete
with domestically produced conventional PSF."  Far Eastern Br. at
17.

The Commission first found that the "the pricing data do not
support the argument that conjugate fiber is superior to residual
PSF."  Final Determination at 22.  Far Eastern attacks this
finding indirectly by asserting that a comparison between
conjugate fiber and conventional PSF is of limited probative
value because "domestic producer's sales are concentrated in so-
called 'residual PSF' and higher-quality recycled fibers."  Far
Eastern Br. at 13.  Simply because the volume of conjugate
produced in the United States was minimal does not necessarily
establish that pricing data for conjugate is unreliable so as to
preclude the Commission from making a comparison between
conjugate and other types of fiber.  Minimal U.S. production of a
product sub-type does not undercut the Commission's overall
material injury determination where, as here, the sub-type
represents a low percentage of total U.S. consumption of the
subject merchandise.  Indeed, that a domestic producer did
produce one type of conjugate fiber (5-7 denier, hollow, slick)
during the POI -- and is capable of shifting capacity to produce

more -- is evidence of direct competition, even if to a limited
extent, and therefore supports the Commission's finding of
interchangeability.[19]

The Commission further found that "a significant number of
importers and purchasers indicated that conjugate fiber and other
certain PSF are interchangeable or somewhat interchangeable."
Final Determination at 22-23.  The Commission noted that "[f]our
[of four] domestic producers, four of fourteen importers, and
nine of thirty purchasers reported that conjugate fiber is
interchangeable with other certain PSF," while "[t]wo importers
and five purchasers reported that conjugate fiber is somewhat
interchangeable with other certain PSF."  Final Determination at
23, n. 93 (citing  Final Report at II-5 to II-8). The Commission
also found that:

> the bulk of the questionnaire responses . . . indicate
> that purchasers buy regenerated fiber because it is
> less expensive.  Therefore, in the absence of low-
> priced regenerated fiber, many purchasers would likely
> buy residual PSF.  A majority of importers and
> purchasers indicated that regenerated fiber and
> residual PSF are interchangeable or somewhat
> interchangeable.

---

[19] The Final Report noted that [     ] is the only domestic
producer that has produced conjugate.  Final Report at V-13,
Table V-5.  Consumption of conjugate fiber "increased
significantly, by [     ] percent in quantity and [     ] percent
in value, during 1997-99.  Final Report at IV-11, Table IV-6.  [
  ] represented to the Commission that it had discontinued
production of conjugate as of March 2000, but that it planned to
start producing again if market conditions improve.  Final Report
at V-13, Table V-5.

<u>Final Determination</u> at 23.  In support of its determination, the

Commission noted that all four domestic producers, five of

fifteen importers, and fifteen of thirty-eight purchasers

reported regenerated fiber to be "interchangeable" with other

certain PSF.  In addition, three importers and five purchasers

considered regenerated fiber to be "somewhat interchangeable"

with other certain PSF."  <u>Final Determination</u> at 23 n.94 (citing

<u>Final Report</u> at II-11 to 15).[20]

A review of the comments given in response to the

questionnaires reveals that the figures for both conjugate and

regenerated fiber are accurate, yet because the results are

mixed, the evidence appears inconclusive with respect to

interchangeability.  Nevertheless, where results are mixed, the

Court may not remand a determination by the Commission simply

because the evidence on the record may support two inconsistent

conclusions. <u>See</u> <u>Grupo Industrial Camesa v. United States</u>, 85

F.3d 1577, 1582 (Fed. Cir. 1996) (citing <u>Consolo v. Fed. Mar.</u>

<u>Comm'n</u>, 383 U.S. 607, 619-20 (1966)).  Thus, the Commission's

---

[20] Far Eastern maintains that conjugate fiber is a superior
product that competes primarily with non-PSF products, especially
goose down.  That conjugate fiber competes with non-PSF products
does not speak to the issue of whether a purchaser would be able
to substitute other types of PSF if the price of conjugate were
to increase substantially.  Far Eastern offers no support for its
assumption that differences in quality necessarily indicate that
purchaser quality preferences are of such an extent that
substitution would not take place regardless of any price
differential.

finding of a significant degree of interchangeability for both conjugate and regenerated fiber is supported by substantial evidence.

## C.  Price Effects

The Commission determined a significant volume of underpriced subject imports of conventional PSF from Korea and Taiwan can and did contribute to a significant degree to price depression.  Final Determination at 24-26; 19 U.S.C. § 1677(7)(C)(ii).  The Commission found that "[t]he cumulated imports of conventional PSF from Korea and Taiwan undersold the domestic product in 162 out of 168 quarterly observations, or 96.4% of the time."  Final Determination at 25. The Commission also found, inter alia, that prices of subject imports of conventional PSF declined overall from 1997 to 1999.  Id.  Rather than directly contesting the Commission's finding of underselling, Far Eastern contends that the Commission erred in not attributing the price decline to a decrease in material costs.  Far Eastern, however, overlooks the fact that prices declined at a faster rate than did costs.[21]   Furthermore, Far Eastern has not pointed to any record evidence that would

--------

[21] Prices declined by 7.1% from 1997 to 1998, and by 13.8% from 1998 to 1999, while raw material costs declined by 6.3% from 1997 to 1998, and 10% from 1998 to 1999.  See Final Report at Table VI-3.

controvert the Commission's observation that prices are not directly based on material costs.[22]   Although Far Eastern is correct -- and the Commission recognized -- that there is in fact some correlation between raw material prices and the domestic prices of PSF, see Final Report at Figures V-2 to 7, this correlation is not of itself sufficient to exclude underselling by subject imports as a cause of price depression.

**II.  Alleged Inconsistency between Material Injury Determinations**

Far Eastern argues that the Commission's analysis and conclusions as to "low-melt" PSF are inconsistent with its analysis and conclusions with respect to conventional PSF.  The record does not show any such inconsistency.  The Commission determined that there was a lack of interchangeability between imported and domestically-produced "low-melt" PSF based on physical differences, different end-uses, and responses by purchasers and importers to the questionnaire.  Final Determination at 28-32.  This determination was not, as Far Eastern claims, predicated on a finding that no lost sales or lost revenue allegations involved low-melt PSF.

Far Eastern asserts that Commissioner Bragg failed to articulate the data and reasoning underlying her determination

---

[22] Far Eastern concedes the lack of evidence of contracts that establish price terms according to raw material prices.  See Far Eastern Br. at 36.

that there was one domestic like product including "low-melt" PSF.  Where a majority of the commissioners render affirmative determinations that are, as here, deemed supported by substantial evidence and are in accordance with law, the Court need not reach the propriety of a concurring commissioner's determination, as the ultimate determination would not be disturbed in any event.

## Conclusion

The Commission's final determination of material injury with respect to conventional PSF was not based on flawed data and was supported by substantial evidence.  Accordingly, the Commission's determination is sustained.

_____
Jane A. Restani
Judge

DATED:  New York, New York
This 14th day of August, 2001