**MUKAND LTD., Plaintiff,**

v.

**UNITED STATES, Defendant,**

v.

**AL TECH SPECIALTY STEEL CORP., et al., Defendant–Intervenors.**

**Slip Op. 96–120.**
**Court No. 93–12–00817.**

Aug. 2, 1996.

O'Melveny & Myers (Craig L. McKee, Michael A. Meyer, Gary N. Horlick), Terre Haute, IN, for plaintiff.

Lyn M. Schlitt, General Counsel; James A. Toupin, Assistant General Counsel, United States International Trade Commission (Shara L. Aranoff), for defendant.

Collier, Shannon, Rill & Scott (David A. Hartquist, Laurence J. Lasoff, Robin H. Gilbert, Lynn E. Duffy), Washington, DC, for defendant-intervenors.

## MEMORANDUM OPINION

GOLDBERG, Judge:

Plaintiff Mukand, Ltd. ("Mukand") commenced this action under 19 U.S.C. § 1516a(b)(1)(B) (1988), challenging the United States International Trade Commission's ("Commission") final affirmative injury determination in the antidumping investigation of stainless steel wire rod from India. *Stainless Steel Wire Rod from India,* USITC Pub. 2704, Inv. No. 731–TA–638 (Final) (Nov. 1993) ("*Commission's Final Determination*"). The Court exercises jurisdiction pursuant to 28 U.S.C. § 1581(c) (1988) and affirms the *Commission's Final Determination.*

## I. BACKGROUND

On December 30, 1992, several domestic stainless steel wire rod producers filed a petition with the Commission alleging that the stainless steel wire rod industry in the United States was materially injured by imports of wire rod from Brazil, France, and India that were being sold at less than fair value. On December 1, 1993, the Commis-

sion published its final determination finding material injury by reason of imports from India. On December 20, 1993, Mukand initiated this action challenging the *Commission's Final Determination.*

## II. DISCUSSION

In deciding a motion for judgment on the agency record, the Court analyzes whether Commerce's determination is supported by substantial evidence, and is otherwise in accordance with the law. 19 U.S.C. § 1516a(b)(1)(B) (1988). "Substantial evidence is something more than a 'mere scintilla,' and must be enough reasonably to support a conclusion." *Ceramica Regiomontana, S.A. v. United States,* 10 CIT 399, 405, 636 F.Supp. 961, 966 (1986) (citations omitted), *aff'd,* 5 Fed.Cir. (T) 77, 810 F.2d 1137 (1987). In applying this standard, the Court affirms agency determinations that are reasonable and supported by the record when considered as a whole, even though there may be evidence that detracts from the agency's conclusions. *Atlantic Sugar, Ltd. v. United States,* 2 Fed.Cir. (T) 130, 138, 744 F.2d 1556, 1563 (1984).

### A. Competition Determination

■ The Court finds that substantial evidence supports the Commission's determination that there is competition between Indian wire rod and domestic wire rod, particularly for low end uses. The record supports a finding that Indian wire rod is low-priced, in part due to its low quality, and is used in place of domestic wire rod for applications in which quality is not critical. *See* Commission Staff Report, INV–Q–182 at I–8 ("Report"); Economics Memorandum, EC–Q–115 at 8 ("Economics Memorandum"). Based upon sales figures, interviews, survey responses, and research prepared by its staff, the Commission reasonably concluded that Indian wire rod displaced domestic wire rod for low end applications. This suggests that the two compete. Accordingly, the Court finds that the Commission's finding of competition is supported by substantial evidence.

Mukand makes two challenges to the Commission's general conclusion that Indian wire rod competes with domestic wire rod.

### 1. Sales by Grade and Dimension

Mukand objects to the Commission's method of analyzing competition by categorizing wire rod imports into five standard product types based upon grade and dimension, and then comparing total sales of Indian wire rod in a particular category against the total sales of domestic producers for each category. Using this method, the Commission found that competition existed because both the domestic and Indian producers recorded sales of all five product types in the United States. *Commission's Final Determination* at I–16 (citing Report at I–30 to I–33).

Mukand argues that this method is misleading because significant variation exists within any particular grade, and these variations dictate what uses the wire rod can actually serve. Mukand also argues that the Commission's reliance on this evidence is inappropriate because there is only a minimal degree of overlap of competition. These arguments are considered in turn.

The Commission has broad discretion in choosing which methodology it will employ to analyze data. *Cemex, S.A. v. United States,* 16 CIT 251, 255–6, 790 F.Supp. 290, 294–95 (1992). In this case, the Commission utilized a method which withstood review by the Court in *Granges Metallverken AB v. United States,* 13 CIT 471, 716 F.Supp. 17 (1989). In *Granges,* Swedish brass was found to compete with the domestic like product based partly on sales data showing that Swedish imports were sold in three of nine standard product categories defined by such factors as alloy, gauge, and width.

Mukand argues that *Granges* does not apply to the present case because the quality of its wire rod differs so widely within each of the Commission's categories that it cannot be grouped successfully into standard categories. This argument fails. In *Granges,* the Swedish brass under investigation was custom made for purchasers' needs, which did not prevent grouping the brass into categories, and then using those categories to assess competition. Some variation in the imported product does not prevent the Commission from using sales by grade as evidence of competition. In general, an analysis based on standard categories is an appropriate method for the Commission to employ.

Mukand argues, however, that when there are such great variances in the quality of the imported product, that the available end uses of the product are affected, successful categorization of the product is prevented. The Court agrees that where the use of standard categories over-simplifies and misrepresents the nature of competition in the market, rigid categories should be abandoned in favor of more direct analysis.

In the present case, the Commission categorized wire rod using "grades," which are defined by a number of factors,[1] rather than strictly applying levels of quality,[2] which is the critical factor in assessing Indian wire penetration into the domestic wire rod market. Thus, the Commission presents only an incomplete analysis of quality, and does not provide the most accurate picture of competition in the wire rod market.

Although the Commission's analysis is awkward, in that it attempts to neatly segment the market by grades, its conclusion is not in error. The Court reviews decisions based upon the entire record. As discussed above, the record does demonstrate that Indian wire rod displaced domestic rod in the low end of the market where quality is not critical. The Court finds, therefore, that the Commission demonstrated competition between domestic and imported wire rod.

Mukand argues, however, that even if competition does exist, it has little impact. The

---

**1.** The factors include cross-sectional shape and diameter, grain size, hardening capabilities, heat resistance, electric resistance, and magnetic permeability. *Commission's Final Determination* at I–7.

**2.** The type of quality referred to here is that which would be measured by the *frequency* that the grade sold would match the standard for that grade. In other words, how often the grade sold would be capable of the same end uses as other product of the same grade.

Commission relied upon several types of evidence in determining that there was an overlap of sales by grade and dimension. One type was statistics provided by Mukand. These statistics show substantial overlap in sales, broken down by grade and dimension, especially in grade AISI 304 and dimensions of less than six millimeters in diameter. For example, [ ] of Indian imports are of AISI 304. For domestic producers, the corresponding figures for the same product expressed as a percentage of production are [ ]. *Commission's Final Determination* at I–16 n. 87 (citing data contained in briefs). Industry data also showed significant market penetration by Indian wire rod. According to the Commission, the volume of imports from India rose from only 97 short tons in 1990 to 4,344 tons in 1992. *Commission's Final Determination* at I–19.

Additionally, the Commission supplemented its statistical analysis with Mukand's own responses to Commissioner Watson's questions regarding end use. In those responses, Mukand admitted some overlap of sales. Taken as a whole, the statistical analysis and the responses could reasonably support a finding that Indian and domestic product sales overlap, thereby supporting the Commission's finding of competition. Therefore, the Court affirms this aspect of the Commission's determination.

## 2. Price

Mukand argues that the Commission's reliance upon evidence that purchasers made their decision based on price was improper. More specifically, Mukand objects to the Commission's reliance upon letters from two domestic producers. Mukand claims that the authors of these letters lacked personal knowledge of the subject matter.

■ The Court notes that the Commission, as the trier of fact, has considerable discretion in weighing the probative value and relevance of evidence. *Iwatsu Elec. Co. v. United States,* 15 CIT 44, 56, 758 F.Supp. 1506, 1517 (1991).

The Commission relied on two letters, one from Al Tech Specialty Steel Corporation ("Al Tech"), and one from Carpenter Technology Corporation ("Carpenter"). The Commission found, partly on the basis of the letters, that by the end of the period of investigation low-priced Indian imports had displaced domestic sales at the low end of the market. *Commission's Final Determination* at I–19 n. 119.

■ The AL Tech letter was written by James Mintun, Jr., Al Tech's Vice Chairman. He states that markets previously served by Al Tech and Armco such as lashing wire, tire wire, and nail wire have been lost, primarily to India, because "dumped India prices allow the redrawers to improve their margins." Def.'s Non-confid. Opp'n to Pl.'s Mot. for J.Agency R., 44.

It is true that Mr. Mintun is not qualified to assess either that the Indian product was "dumped," a legal determination, or the reasons why redrawers purchase Indian wire. However, these are not the points upon which the Commission relied. The Commission used this letter to show that Al Tech previously had served this market, and that sales were lost to Indian imports. Because Mr. Mintun's position affords him knowledge of his customers' purchasing habits, the Commission could reasonably rely upon Mr. Mintun's letter for these points.

Similarly, William J. Pendleton, the Director of Corporate Affairs at Carpenter, wrote a letter claiming that his company was forced out of the "so-called 'low end' of the market" by lower-priced Indian imports. In Pendleton's letter, he asserts that Indian wire rod is of low quality. *Id.* at 44–5.

■ Mukand raises two arguments with respect to Pendleton's letter. First, Mukand claims that evidence on the record shows that Carpenter has reported lost sales and revenues only to French wire rod, and not Indian wire rod. Second, Mukand claims that Pendleton has no personal knowledge of the quality of Indian wire rod. The Court finds these arguments unpersuasive.

The Commission relied upon Pendleton's letter for evidence that a domestic producer was forced out of the low end of the market. If there is evidence that Carpenter previously reported French wire rod as the cause of its lost sales and revenues, then the Commis-

sion, as the trier of fact, was entitled to weigh the probative value of this letter. With respect to Mukand's second objection, the Commission did not rely upon Pendleton's letter to support any quality analysis.

The Court notes that in finding that Indian and domestic wire rod compete on the basis of price, the Commission also evaluated purchasers' survey responses. Several purchasers listed price as their primary or secondary consideration when ranking the major factors involved in their decision to buy. *Commission's Final Determination* at II–29. This evidence suggests that a number of purchasers obtained price quotes, both from importers and domestic producers, and made their purchasing decisions mainly on the basis of price. *Commission's Final Determination* at I–16, 17.

■ The record demonstrates that one of the primary advantages of Indian wire rod is its price. It was therefore reasonable for the Commission to assess the importance of price in its competition determination. The use of letters, surveys, and other information gathered from participants in the wire rod industry is appropriate to make this determination. The Commission is empowered as finder of fact to weigh the credibility of this evidence. The Court holds that the Commission's determination of competition on the basis of price is supported by substantial evidence and affirms the Commission's determination in this respect.

## B. Fungibility Determination

■ In determining that the domestic wire rod industry was injured, the Commission assessed the effects of Indian imports both separately and cumulatively with those of France and Brazil. Cumulation is mandatory where the Commission makes a finding of material injury. 19 U.S.C. § 1677(7)(C)(iv) (1988 & Supp. IV 1992). To determine what imports to cumulate, it is necessary to assess which imports compete with domestic like product. The competition finding is based upon a four factor analysis:

(1) the degree of fungibility between the imports from different countries and the domestic like product, including consider-

ation of specific customer requirements and other related questions;

(2) the presence of sales or offers to sell in the same geographical markets of imports from different countries and the domestic like product;

(3) the existence of common or similar channels of distribution for imports from different countries and the domestic like product; and

(4) whether the imports are simultaneously present in the market.

*Certain Cast–Iron Pipe Fittings from Brazil, the Republic of Korea, and Taiwan,* Inv. Nos. 731–TA–278–280 (Final), USITC Pub. 1845 (May 1986), *aff'd, Fundicao Tupy S.A. v. United States,* 12 CIT 6, 9–10, 678 F.Supp. 898, 902, *aff'd* 7 Fed.Cir. (T) 9, 859 F.2d 915 (1988). Mukand concedes the latter three factors, but it makes several challenges to the Commission's determination of fungibility.

### 1. Survey Responses

■ Plaintiff objects to the Commission's fungibility finding on the grounds that it is based in part upon a flawed survey. According to Mukand, the Commission should not have relied on a survey that asked purchasers whether Indian and domestic wire rod were "interchangeable" where the word "interchangeable" was never defined in the survey. Mukand claims that the survey responses do not necessarily indicate whether imports can serve the same end uses, and therefore do not establish whether imports are market substitutes or fungible.

The Commission evaluated the survey responses of fourteen purchasers. Ten of these purchasers claimed that Indian and domestic wire rod are interchangeable. The Commission analyzed these responses as follows: "[a]lthough many perceived some quality differences between the various imports and the domestic product, purchasers responding to the Commission's questionnaire indicated that Brazilian,. French and Indian imports respectively were nonetheless interchangeable with the domestic product, and that they purchased them for the same end uses." *Commission's Final Determination* at I–16 (citations omitted).

The Court notes that in making its fungibility determination, the Commission also relied, in part, upon economic analysis prepared by its staff. As part of its research, the Commission's economic staff analyzed the same survey responses. This analysis showed that Indian wire rod and domestic wire rod were sold to the same customers for similar uses, were purchased for the production of similar products, and share a common presence in certain market applications despite differences in quality. Economics Memorandum at 21. In particular, the Court notes that the economics staff indicated that they based their analysis on a number of specific survey questions concerning product quality and differentiation to reveal purchasers' actual buying practices. *Id.*

The Court reviews the Commission's determination based upon the entire evidentiary record. Although the Court shares Mukand's concerns that the survey should have defined the term "interchangeable," the Commission acted reasonably in relying upon the survey. Both the Commission's own analysis of the survey and the analysis of its economics staff provide substantial evidence that the information contained in the survey responses was reliable. The Court therefore upholds this aspect of the Commission's fungibility determination.

### 2. *Quality Differential*

█ Next, Mukand challenges the Commission's fungibility determination on the grounds that Indian wire rod is of such poor quality, relative to domestic rod, that Indian and domestic wire rod cannot be used for the same applications. The Court notes that Mukand raised a similar argument with respect to the Commission's overall finding of competition. For similar reasons, the Court rejects Mukand's fungibility argument.

Evidence on the administrative record supports a finding that there is some degree of fungibility between Indian wire rod and domestic wire rod. The record demonstrates that the Indian product is generally viewed in the market as being of comparatively low quality, Economics Memorandum at 19–20, and that its main advantage is its low price. Staff Report at I–53–4, I–72. The record

shows that end users chose Indian wire rod over domestic wire rod for low end uses in which quality was not critical. Economics Memorandum at 19–20. To the extent that domestic and Indian wire rod can accomplish the same low end uses on a commercially practicable basis, Indian wire rod is fungible with these other products. The actual displacement of domestic wire rod by Indian wire rod is evidence that these products are fungible at the low end of the wire rod market.

In applying the four factor analysis, the Commission need not find a "complete overlap" of competition, but merely a "reasonable overlap" in order to cumulate imports. *Wieland Werke, AG v. United States,* 13 CIT 561, 563, 718 F.Supp. 50, 52 (1989). Because the Commission may base its finding upon a reasonable overlap of competition, it follows that the Commission need only find a reasonable overlap of fungibility to support its competition finding.

The Court finds that differences in quality do not prevent Indian and domestic wire rod from being considered fungible.

### 3. *Same Customers*

In analyzing fungibility, the Commission considered evidence that the same customers bought both Indian and domestic wire rod. Mukand's final argument is that sales to the same customers does not indicate fungibility. Mukand claims that due to Indian wire rod's low quality, the same customer may purchase Indian and domestic wire rod for different end uses.

A similar argument was made in *Wieland Werke.* 13 CIT at 565, 718 F.Supp. at 53–54. In that case, the importer of West German brass argued that sales to similar customers did not indicate competition because customers purchased each country's imported product for different uses—German products were purchased for high-quality or specialty uses, and all other imports for less critical uses. The Court in *Wieland Werke* rejected this argument because it found that purchasers made purchasing decisions based on price as well as on quality. *See Wieland Werke* 13 CIT at 565, 718 F.Supp. at 54.

The Court similarly rejects Mukand's argument. In the wire rod market, purchasers may choose between different products, each presenting different combinations of price and quality. A purchaser may select Indian wire rod over its domestic counterpart for applications which do not require high quality inputs, in order to take advantage of Indian wire rod's low price. However, the very same purchaser may purchase domestic wire rod for higher end applications. As stated above, to the extent that domestic, or other wire rod, can also accomplish these low end uses, Indian wire rod is fungible with these other products. Under these circumstances, the Commission's analysis that Indian and domestic product were sold to similar purchasers may reasonably be taken to indicate competition among these products. The Court therefore upholds the Commission's analysis.

### III. Conclusion

The Court finds that quality differences between Indian stainless steel wire rod and the domestic like product are not so pronounced as to prevent a reasonable overlap of competition between them. Consequently, the Court holds that the Commission's cumulation of Indian imports with those of other subject countries and their finding of competition are both supported by substantial evidence and are otherwise in accordance with the law. Judgment will be entered accordingly.

### ORDER

This case came before the Court on plaintiffs' motion for judgment on the agency record, and defendant and defendant-intervenor's opposition thereto. As the Commission has issued a determination supported by substantial evidence and in accord with the law pursuant to 19 U.S.C. § 1516a(b)(1)(B) (1988), it is hereby

**ORDERED** that the Commission's finding of material injury in *Stainless Steel Wire Rod from India*, USITC Pub. No. 2704, Inv. No. 731–TA–638 (Final) (Nov. 1993) is affirmed; and it is further

**ORDERED** that judgment is entered for defendant. This action is hereby dismissed.