SLIP OP. 06-140

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NOVIANT OY, et al., <br><br>            Plaintiffs, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br>            Defendant, <br><br> and <br><br> AQUALON COMPANY, <br><br>            Defendant-Intervenor. | **Before: Gregory W. Carman, Judge** <br><br> Court No. 05-00467 |

[Plaintiffs' Motion for Judgement on the Agency Record is denied.]


       Arent Fox Kintner Plotkin & Kahn, PLLC (Matthew J. Clark and Patricia Pai-Lun Yeh) for Plaintiffs.

       James M. Lyons, General Counsel, Neal J. Reynolds, Assistant General Counsel, U.S. International Trade Commission (June B. Brown), for Defendant.

       Haynes & Boone, LLP (Edward M. Lebow) for Defendant-Intervenor.

                                           September 12, 2006

## OPINION

       CARMAN, JUDGE:  This matter is before this Court on Plaintiffs' Motion for Judgment on the Agency Record Pursuant to Rule 56.2 ("Plaintiffs' Motion").  The Court, having considered Plaintiffs' Motion and memorandum in support thereof, Defendant's and Defendant-Intervenor's responses, Plaintiffs' reply, the Administrative Record, and all other papers submitted herein,

finds there is substantial evidence on the record to support the International Trade Commission's

("ITC" or "Defendant") decision to cumulate imports of purified carboxymethylcellulose

("CMC") from Finland, Mexico, the Netherlands, and Sweden.  Therefore, Plaintiffs' Motion is

denied.

### PROCEDURAL HISTORY

On June 9, 2004, Defendant-Intervenor, Aqualon Company ("Aqualon") filed a petition

with the Department of Commerce, International Trade Administration, alleging that a domestic

industry was materially injured or threatened with material injury by certain imports of purified

CMC[1] from Finland, Mexico, the Netherlands, and Sweden.  (Mem. of Def. U.S. Int'l Trade

Comm'n in Opp'n to Pls.' Mot. for J. on the Agency R. ("Def.'s Mem.") at 3.)  In response to

Aqualon's petition, the ITC instituted preliminary investigations of purified CMC imported from

Finland, Mexico, the Netherlands, and Sweden.  Purified Carboxymethylcellulose from Finland,

Mexico, [the] Netherlands, and Sweden, 69 Fed. Reg. 33,938 (June 17, 2004) (prelim.

---

[1]Commerce defined the scope of the imported product subject to the investigation as

> all purified carboxymethylcellulose (CMC), sometimes also referred to as purified
> sodium CMC, polyanionic cellulose, or cellulose gum, which is a white to off-white,
> non-toxic, odorless, biodegradable powder, comprising sodium CMC that has been
> refined and purified to a minimum assay of 90 percent.  Purified CMC does not
> included unpurified or crude CMC, CMC Fluidized Polymer Suspensions, and CMC
> that is cross-linked through heat treatment.  Purified CMC is CMC that has
> undergone one or more purification operations which, at a minimum, reduce the
> remaining salt and other by-product portion of the product to less than ten percent.

Purified Carboxymethylcellulose from Finland, Mexico, The Netherlands, and Sweden, 70 Fed.
Reg. 39,334, 39,335 (Int'l Trade Comm'n July 7, 2005) (final determination).

investigation).  In its preliminary determination, the ITC found a reasonable indication that the

domestic industry was materially injured by subject imports of purified CMC from Finland,

Mexico, the Netherlands, and Sweden.  Purified Carboxymethylcellulose from Finland, Mexico,

[the] Netherlands, and Sweden, 69 Fed. Reg. 45,851 (July 30, 2004) (prelim. determination).

The period of investigation ("POI") covered the years 2002 through 2004.

Plaintiffs challenge the ITC's final affirmative injury determination.  Purified

Carboxymethylcellulose from Finland, Mexico, [the] Netherlands, and Sweden, USITC Pub.

3787, Inv. Nos. 731-TA-1084-1087 (June 2005) (Final) ("Final Report").[2]  Although the ITC

rendered its final affirmative determination with respect to cumulated subject merchandise from

Finland, Mexico, the Netherlands, and Sweden,[3] Plaintiffs challenge the finding only as it relates

to subject merchandise from Finland.  The U.S. Department of Commerce published the resulting

antidumping duty orders in the Federal Register on July 11, 2005.  Purified

Carboxymethylcellulose from Finland, Mexico, the Netherlands and Sweden, 70 Fed. Reg.

39,734 (Dep't Commerce July 11, 2005) (notice of antidumping duty orders).

---

[2]A chronology of the relevant events during the investigation is also available in the ITC Final Report at page I-1.

[3]The ITC published the final affirmative injury determination in the Federal Register on July 7, 2005.  Purified Carboxymethylcellulose from Finland, Mexico, The Netherlands, and Sweden, 70 Fed. Reg. 39,334 (Int'l Trade Comm'n July 7, 2005) (final determination).

## FACTUAL BACKGROUND

The plaintiffs in this case are related companies. Plaintiff JM Huber Corporation is the parent company of plaintiffs Noviant Inc. and Noviant OY.[4] Noviant OY produces purified CMC in Finland, and Noviant Inc. is the importer of record of the subject merchandise. Noviant BV and Noviant AB, Noviant OY affiliates, produce purified CMC in the Netherlands and Sweden, respectively. The ITC's investigation included purified CMC imported from Noviant OY, Noviant BV, and Noviant AB. (Pls.' Noviant OY, Noviant Inc., and JM Huber Corp.'s Mem. of Law in Supp. of Mot. for J. on the Agency R. Pursuant to R. 56.2 ("Pls.' Mem.") at 3.) Noviant is "the world's largest producer of purified CMC." (Def.-Intervenor Aqualon Co.'s Mem. in Opp'n to Mot. for J. on the Agency R. by Pls. Noviant OY, et al. ("Aqualon Mem.") at 2.) Defendant-Intervenor, Aqualon Company ("Aqualon"), is the only domestic producer of purified CMC. Id.

Purified CMC is a multipurpose thickener and binder. Purified CMC is found in common household items, e.g., toothpaste, makeup, detergent, and ice cream. The subject merchandise is also critical in paper production to improve smoothness and durability. In oilfield drilling, purified CMC is added to drilling fluids to increase drilling efficiency. (Pls.' Mem. at 3.) See also ITC Final at 5. There are five sectors or segments in which purified CMC is used: food, oilfield, paper and board, personal care and pharmaceuticals, and "other uses." ITC Final at 14.

---

[4]For convenience and unless otherwise noted, this Court refers to Plaintiffs, JM Huber Corporation, Noviant OY, and Noviant Inc., collectively as "Plaintiffs" or "Noviant."

Purified CMC is used both in government regulated and non-regulated industries. (Pls.'
Mem. at 3.) See also ITC Final at 14-15. "In 'regulated' uses (such as food, pharmaceutical, and
personal care products) where the product is intended for human consumption, CMC must be
purified to a level of 99.5 percent. In 'non-regulated' uses, CMC may be purified to a level
below the 99.5 percent level." ITC Final at 14-15 (footnotes omitted). In order for purified
CMC to be sold into a regulated industry, the production facility in which the product was
manufactured must comply with Good Manufacturing Practices standards. Id. at 15. Noviant
OY does not and did not during the POI possess the necessary certification to produce purified
CMC for the regulated food and personal care industries. (Pls.' Mem. at 4) See also ITC Final at
27 (Comm'r Pearson dissenting). During the POI, purified CMC manufactured in Finland by
Noviant OY was sold exclusively in the unregulated paper and oilfield sectors. (Pls.' Mem. at 4.)

Demand for purified CMC is driven by downstream need for the product. ITC Final at
14. During the POI, downstream users of purified CMC "steadily and markedly" increased their
consumption of the product. Id. at 15. Demand for purified CMC increased in each of the four
leading end-use segments (not including "other uses"), but total demand for purified CMC was
strongly influenced by the growth in demand in the oilfield segment. Id.

During the POI, Aqualon increased its production capacity and share of the purified CMC
market. Id. Nonetheless, Aqualon would have been unable to supply the domestic purified CMC
market during the POI. Id. Still, "the volumes of the subject imports declined in market share
terms and when compared to domestic production." Id. at 17. Notwithstanding, the ITC found
"that the subject import volumes, and the absolute increases in those volumes, were significant

during the period." Id. at 18.  According to the ITC, "the significant and increasing volumes of

the subject imports permitted them to have a significant adverse impact on domestic pricing in

both 2003 and 2004, despite their loss of market share during the period of investigation."  Id.


## PARTIES' CONTENTIONS

A.      Plaintiffs' Contentions

1.      Memorandum in Support of Motion for Judgment on the Agency Record

Plaintiffs take issue with the ITC's decision to cumulate subject imports of purified CMC

from Finland with those from Mexico, the Netherlands, and Sweden.  (Pls.' Mem. at 1.)

According to Plaintiffs, the evidence on the record does not establish that there was a reasonable

overlap in competition between the Finnish subject imports and those from Mexico, the

Netherlands, and Sweden; neither are the products interchangeable.  (Id. at 2.)  Plaintiffs opine

that the ITC's analysis of the factors used to establish reasonable overlap

> fails the substantial evidence standard because [the ITC] ignore[s] evidence from
> parties in the best position to know how Finnish purified CMC is used, and
> disregard[s] substantial evidence on the record demonstrating that there is no actual
> reasonable overlap of competition among Finnish purified CMC and purified CMC
> from other subject countries.

(Id. at 13.)

In determining whether there was a reasonable overlap in competition between Finnish

purified CMC and purified CMC from other subject countries, Plaintiffs claim that the ITC relied

upon questionnaire responses from parties that had no or insufficient knowledge of Finnish

purified CMC.  (Id.)  According to Plaintiffs, a substantial percentage of questionnaire

respondents, 99.2% of which identified themselves as end-users of purified CMC, "reported that

Finnish purified CMC is 'Sometimes' or 'Never' interchangeable with other purified CMC." (Id.

at 14.)  In addition, Plaintiffs report that of those questionnaire respondents that reported that

imported purified CMC was always or frequently interchangeable with domestic purified CMC

"most of the responses came from parties that did not purchase the Finnish product, or were

using the purified CMC in regulated applications and therefore could not lawfully use the Finnish

product despite their 'opinion.'" (Id. at 15 (footnote omitted).)  Plaintiffs submit that the

questionnaire responses that Finnish purified CMC is always or frequently interchangeable with

other purified CMC used in the oilfield and paper industries do not indicate a reasonable overlap

of overall competition in the purified CMC marketplace because other countries have "negligible

or very small" sales of purified CMC into those industries. (Id. at 16.)

Plaintiffs posit that the questionnaire respondents were not–as the ITC asserts–"aware of

the basic characteristics" purified CMC. (Id. at 17 (quoting ITC final at 10, fn 67).)  If the

questionnaire respondents had a basic knowledge of Finnish purified CMC, Plaintiffs opine that

the respondents would have known that Finnish purified CMC is not interchangeable with

purified CMC from other countries that is produced for use in regulated industries. (Id.)

Plaintiffs contend that the ITC's determination is not supported by substantial evidence on the

record because Defendant "based its decision on theoretical fungibility as hypothesized by parties

that do not import or use Finnish CMC." (Id.)

Plaintiffs' maintain that the ITC has previously relied heavily on end-user responses when

the subject merchandise is used in distinct end uses but failed to do so in this instance. (Id. at 11,

14, 20.)  In discussing the questionnaire responses specifically from end users of purified CMC,

Plaintiffs point out that four of eleven "answered that purified CMC from Finland was 'Always'

or 'Sometimes' interchangeable with the Finnish product." (Id. at 18.)  Of those four, Plaintiffs

contend that two responses must be discounted because the respondents use purified CMC in

regulated industries, and Finnish purified CMC is not available for use in such industries.  (Id. at

19.)  Plaintiffs disregard the remaining two "always" or "sometimes" responses as

inconsequential because the minimal or nil competition from Mexican purified CMC in the paper

and oilfield sectors results in a conclusion that there is no reasonable overlap in competition.  (Id.

at 18-19.)  Plaintiffs argue that the ITC failed to justify why it ignored "its own precedent, or why

unequivocal statements by uniformed parties about the interchangeability of a product is

determinative of whether statements by knowledgeable and informed end-users can be ignored,

or, as here, diluted with irrelevance." (Id. at 20.)

Plaintiffs next argue that data collected by the ITC do not support Defendant's finding

"that a reasonable overlap of competition exists between imports from Finland and other imports

because certain purchasers bought from Finland and one or more of the other subject countries."

(Id. at 21.)  Plaintiffs note that Finnish imports of purified CMC represented zero percent of the

subject imports in the two regulated sectors (food and personal care) and a de minimis four

percent of the catch-all sector ("all other uses").  (Id.)  Further, Plaintiffs add that the only sector

in which another subject country had appreciable presence was the oilfield sector, in which

imports of purified CMC from the Netherlands represented 10.1% of the market.  Plaintiffs state

that "the [ITC's] finding that there was an actual overlap of competition because of simultaneous

presence in relevant end use segments rests wholly on the 10% market share of [Dutch] shipments in the Oilfield sector over the period of investigation." (Id. at 23.) Plaintiffs then asseverate that "[i]n every other market segment, there is no overlap of actual competition at all." (Id.) Plaintiffs deduce that when "viewed in the context of the entire market containing five end use sectors, over a period of three years, involving five countries, the Netherlands' market share is not substantial enough to itself constitute a reasonable overlap of competition for all purified CMC from four countries." (Id.) Plaintiffs conclude that "a single point of such limited competition between two countries cannot be a reasonable overlap of competition between and among four countries." (Id.)

Plaintiffs add that "[c]omparing shipments between Finland, on the one hand, and Mexico, Sweden, and the Netherlands collectively, on the other, within the two major market segments in which Finland participates (oil and paper), the apparent overlap is less than 8%." (Id. at 24 (footnote omitted).) Plaintiffs declare that the ITC has declined to cumulate in past cases in which there was a greater overlap of competition. To be consistent with past practice, Plaintiffs stress that the ITC's findings in this case must be rejected. (Id.)

Plaintiffs also argue that the ITC's reliance on the similar physical properties of the purified CMC from the subject countries is misguided. "If chemical and production similarities of the product were determinative of whether or not the product is interchangeable, there would be no need for [Food and Drug Administration] approval, plant qualifications for Good Manufacturing Practices ('GMP'), and no actual legal impediment to putting the same product in drilling fluids and toothpaste." (Id. at 27.) Plaintiffs reiterate that the Finnish plant "simply

cannot make purified CMC for regulated uses at all." (Id. at 28.) According to Plaintiffs, the

Finnish plant's prohibition from selling to regulated industries "is a matter of law not

convenience." (Id.)

Plaintiffs adduce that Aqualon's own witness refutes the ITC's finding of

interchangeability. Plaintiffs point to testimony that purportedly confirms that "purified CMC

made for the oil-drilling area is 'not generally used in other areas.'" (Id. at 28 (citing Hr'g Tr.

169:2-3 (Herak).) While Aqualon's witness testified "that subject merchandise used in food

grades and paper grades were 'quite similar', [sic]" Plaintiffs press that the witness did not

indicate that Finnish purified CMC could be interchanged with purified CMC qualified for use in

regulated sectors. (Id. at 28.)

Plaintiffs insist that "the issue of cumulation turns on a comparison of foreign, not

domestic, product." (Id. at 29.) Therefore, according to Plaintiffs, it is irrelevant that Aqualon

groups purified CMC used in regulated and non-regulated end uses in the same product family.

(Id. at 28.) Plaintiffs urge that Aqualon's product grouping "provides no information to suggest

whether purified CMC for regulated and non-regulated purposes are actually used

interchangeably, or are fungible, or compete with each other for purposes of cumulation." (Id.)

Plaintiffs posit that "[w]hatever [Aqualon's product grouping] may say about Aqualon and its

U.S. produced CMC, it says nothing about the imports from the subject countries." (Id. at 28-

29.)

Plaintiffs postulate that because the ITC's

decision to cumulate subject imports from Finland with subject imports from
Mexico, the Netherlands, and Sweden was unsupported by substantial evidence on

the record, its failure to separately analyze and determine whether subject imports from Finland, alone, caused or threatened to cause, material injury is also not supported by substantial evidence and not in accordance with law.

(Id. at 29.)  Plaintiffs insist that the ITC must "separately examine the volume of [subject] imports [from Finland], their effect on prices, and their impact on the sole domestic producer, Aqualon."  (Id. at 29.)  Plaintiffs maintain that such an evaluation would lead to an ITC finding that imports of purified CMC from Finland did not cause or threaten to cause material injury to the domestic industry.  (Id.)

On the bases of the arguments they put before the Court, Plaintiffs ask this Court to order the ITC "to de-cumulate Finland from its injury analysis" and "to separately analyze the effect of Finnish subject imports on the domestic industry."  (Id. at 30.)

2.      Reply brief

In its reply brief, Plaintiffs argue that the ITC's "decision must comprehend the whole of the market and the competitive framework, not just one part of it."  (Pls.' Reply to Def. & Def.-Intervenor's Opp'n to Pls.' R. 56.2 Mot. for J. ("Pls.' Reply") at 1.)  Plaintiffs identify as the issue "whether there are lines of intersection across the matrix created by those distinct market segments and import sources sufficient to establish a reasonable overlap of competition overall between Finland and each other country."  (Id. at 2-3.)  Plaintiffs complain that the ITC departed from past practice by concentrating on "discrete sub-periods" of the POI to determination whether a reasonable overlap of competition existed.  (Id. at 6.)  According to Plaintiffs, the ITC should not be permitted to "focus on select sub-periods within the POI, subordinat[e] the POI to

sub-periods within the POI, or allow[ ] isolated pockets of competition to swamp the larger

profile of the market as a whole." (Id.)

Plaintiffs next submit that "none of the parties explain[s] the relevance of internal

shipment ratios (the % of a country's own shipments by end use) to the question of whether

imports from different countries compete with one another in the market." (Id. at 8.) Plaintiffs

maintain that in the food, personal care, and paper sectors, which represented 61% of purified

CMC shipments during the POI, there is no overlap in competition between Finland and imports

from the other subject countries. (Id. at 10.) Plaintiffs add that the "oilfield segment . . . showed

little overlap with the Netherlands and none or de minimis as between Finland and either Mexico

or Sweden." (Id.) In the "other uses" sector, Plaintiffs claim that "Finland's small and declining

presence over the POI leads to little overlap with the Netherlands and Mexico and none

whatsoever with Sweden." (Id. at 11.) Plaintiffs asseverate that "a reasonable mind could not

conclude that there is a reasonable overlap of competition between CMC from Finland and that

from Mexico, the Netherlands, or Sweden." (Id.)

Plaintiffs next assert that the ITC relied upon dubious opinion evidence in reaching its

decision to cumulate subject imports. Plaintiffs complain that one purchaser answered the

question in the ITC's questionnaire about the interchangeability of Finnish purified CMC

although that purchaser had no knowledge of the Finnish product. (Id. at 12.) Plaintiffs also cite

as unreliable a response from a purchaser that identified Finnish and Swedish purified CMC as

interchangeable although that purchaser did not purchase Swedish CMC during the POI and had

no knowledge of any other country-pairs. (Id. at 13.) Plaintiffs urge that "[i]f market

participation validates opinion, [the ITC] must accept that statements by market participants that

they are unaware of competition are positive evidence of no competitive overlap and must

accord[ ] [those statements] equal weight." (Id.)

Lastly, Plaintiffs argue that the ITC placed too much importance on the oilfield sector of

the purified CMC market. Plaintiffs allege that the questionnaire responses demonstrate a lack of

actual competition because the responses emphasize technical performance not competition or

market or price knowledge. (Id. at 14.) Plaintiffs complain that the ITC did not consider the

quality of the questionnaire responses "and overlooked that under its market involvement

standard, the greater number of O ('no familiarity') responses were the critical elements." (Id. at

15.) Plaintiffs submit that it is unreasonable for the ITC to rely upon responses from purchasers

with little or no competitive familiarity and to rely upon opinions that lack reasonable

foundation. (Id.) Confusingly, plaintiffs conclude by stating that they "respectfully urge this

Court rule that the [ITC]'s finding that there is a reasonable overlap of competition between

CMC from Finland and that from Mexico, the Netherlands, or Sweden."[5]


B.      Defendant's Contentions

Defendant argues that the ITC evaluated all record evidence and found "on balance" a

reasonable overlap of competition among the subject imports and the domestic like product.

(Def.'s Mem. at 2.) In addition, Defendant complains that Plaintiffs "mistakenly describe both

the legal standard for cumulation and the evidence on which the [ITC] based its cumulation

---

[5]This Court presumes that Plaintiffs intended to state that they urge this Court to reverse
and remand the ITC's finding of a reasonable overlap of competition.

decision." (Id.) Finally, Defendant submits that the ITC was under no obligation to conduct a separate injury determination for imports of the subject merchandise from Finland because the ITC's decision to cumulate was supported by substantial evidence on the record. (Id.)

In support of the ITC's cumulation finding, Defendant distills the ITC's fungibility analysis. Defendant acknowledges that no shipments of purified CMC from Finland entered the regulated sectors during the POI. (Id. at 13.) However, the ITC points out "that each of the four countries, as well as the U.S. producer, shipped substantial quantities of CMC into the oilfield and other end-use sectors at various points during the period of investigation." (Id.)

Defendant also offers that questionnaire responses support the ITC fungibility finding. According to Defendant, the domestic producer, twenty-six of thirty-five importers, and forty-three of fifty-nine purchasers "reported that the domestic product and the subject imports were always or frequently interchangeable. Similarly, the domestic producer, 27 of 35 importers, and 30 of 41 purchasers indicated that the subject imports were always or frequently interchangeable with each other." (Id.) Defendant adds that the data on "country pairs" demonstrates that the subject imports are always or frequently interchangeable with each other. (Id.) As added support for the fungibility finding, Defendant asserts that "several large purchasers reported purchases of subject imports from both Finland and one or more of the other three subject countries during the period of investigation." (Id. at 15.)

Defendant further alleges that "the physical differences between CMC sold into the various end-use sectors, particularly the non-regulated paper and board, oilfield, and other use sectors, were not particularly substantial." (Id.) The ITC found that "the various grades of CMC

all comprised a continuum of products, and all forms of CMC were reasonably considered part of

the same single like product." (Id. at 16.)  Defendant notes that there are no "particularly

significant differences in chemical composition and production processes between various grades

[of purified CMC] sold into different end-use sectors." (Id.)  Defendant also contends that, to

some extent, purified CMC of higher purity could be substituted for lower purity purified CMC.

(Id.)  In addition, Defendant submits that "some end users could modify their production

processes to a CMC grade that differed in purity or granular composition from its intended use."

(Id.)

Defendant suggests that Plaintiffs may have wished that the ITC weigh the evidence

before it differently.  However, Defendant presses that the ITC analyzed all of the data and

"reasonably found, on balance, that there was a reasonable level of fungibility between the

imports from Finland and the subject imports from the other three countries during the period."

(Id. (footnote omitted).)  Accordingly, Defendant asks that this Court affirm the ITC's fungibility

analysis.  (Id.)

Defendant advises that the ITC determined that other factors indicated that there was a

reasonable overlap of competition between the imports of purified CMC from Finland and

subject imports from the other subject countries.  (Id. at 17.)  The ITC found

> that the subject imports shared similar channels of distribution . . . that subject
> imports from each country as well as the domestic product were present in substantial
> volumes in the U.S. market during each year of the period of investigation, and that
> the subject imports from each country and the domestic product were sold on a
> nationwide basis, thus indicating that the subject imports were sold in the same
> geographic areas during the period.

(Id. (internal citation omitted).)  Defendant notes that Plaintiffs do not challenge the ITC findings

of reasonable overlap of competition based upon the other cumulation factors and suggests that

these other factors of cumulation provide sufficient bases to support the ITC's finding of a

reasonable overlap of competition.  (Id.)

Defendant next challenges Plaintiffs' characterization of the legal standard for

cumulation.  According to Defendant, Plaintiffs premise their arguments on the misplaced

assumption that fungibility is the determining factor in the ITC's cumulation analysis.  (Id. at 18.)

Defendant asserts that fungibility is but one of the factors that the ITC considers in determining

whether cumulation is appropriate.  (Id.)  Even in the fungibility assessment, Defendant claims

that the goods being compared need not be "highly fungible."  (Id.)  Neither–Defendant

submits–does the law require that the ITC only analyze fungibility in overlapping end uses.  (Id.)

Defendant stresses that there are several factors that the ITC considers when assessing

fungibility.  (Id.)  Moreover, Defendant argues that "differences in end uses and product quality

between subject imports from different countries will not, by themselves, defeat a finding by the

[ITC] of a reasonable overlap of competition."  (Id. at 19.)

Defendant adds that the ITC is "not bound by prior findings, even in cases involving the

very same subject and domestic merchandise."  (Id. at 20.)  Further, Defendants maintain that

neither the ITC nor this court has established a bright-line percentage of competitive overlap that

is sufficient to support cumulation.  (Id.)  The only test by which the ITC is bound, Defendant

states, is "whether there is a 'reasonable overlap of competition.'"  (Id. (citation omitted).)

Defendant insists that the ITC "did not ignore evidence that Finland did not compete with the other subject imports in certain end-use segments." (Id.) Defendant explains that the ITC "focused on data showing each subject country's proportion of shipments into each end-use sector for each year of the period examined." (Id. at 21.) Specifically, Defendant notes that the ITC "focused on yearly data, particularly the years when overlap with Finland was the greatest for each subject country." (Id.) Defendant proposes that this yearly data is more informative than the combined POI data upon which Plaintiffs relied in their brief. (Id.) Further, Defendant contends that the statute, this court, and the ITC do not require "actual," rather than "theoretical," competition to establish a reasonable overlap of competition. (Id. at 21-22.) Defendant also reminds this Court that the ITC has "broad discretion in analyzing cumulation, including the factors and time period considered." (Id. at 21.)

In addition, Defendant accuses Plaintiffs of mischaracterizing the cumulation data and the manner which the ITC weighed the data. (Id. at 23.) According to Defendant, the ITC predicated its cumulation finding only on the competition overlap in non-regulated end-use sectors for purified CMC. (Id.) Defendant defends the ITC's use of importer, distributor, end-user, and domestic producer questionnaire responses to determine whether cumulation was appropriate. (Id. at 25.) According to Defendant, the ITC did not give more weight to end-user responses but weighed all responses equally. (Id. at 25-26.) Defendant also reasons that it was acceptable for the ITC to rely upon all questionnaire responses, even though the respondent may not have purchased purified CMC from Finland, because the respondents were required to certify the information provided. (Id. at 26-27.)

On the cumulation factor of cross-selling, Defendant takes issue with Plaintiffs' reliance on the aggregated POI data. According to Defendant, "[t]he aggregated data . . . are less informative than yearly data and also are presented on a different basis than that customarily used by the [ITC] in analyzing overlap in end uses." (Id. at 29.) Consistent with the ITC's prior practice, Defendant advises that the ITC "focused on data showing each subject country's proportion of shipments into each end-use sector for each year of the period examined." (Id.) Defendant insists that the annual data presents a different picture of the overlap of competition between Finland and the other subject countries than that painted by Plaintiffs' in their brief. (Id. at 30.) Defendant asserts that "the record . . . established that there was a reasonable overlap of competition in the non-regulated end uses, particularly in the oilfield and 'other' uses sectors of the market." (Id. at 31.)

Defendant also explains that the ITC also considered evidence from purchasers who bought purified CMC from Finland and at least one other subject country. Although the purchaser may have purchased purified CMC for different end uses, Defendant contends that "purchasers who bought for more than one end use regarded prices in one sector as influencing prices in another." (Id. at 32.)

Defendant next defends the ITC's position that the "physical differences between CMC sold into the various end-use sectors are not generally substantial." (Id. at 33.) Defendant argues that the ITC did not state "that non-regulated CMC was substitutable for highly purified CMC in regulated uses." (Id.) Nonetheless, Defendant urges that "as a product continuum, CMC made into various grades and for various end uses" shares "certain chemical characteristics and

production processes." (Id. at 34.) Defendant adds that the ITC also considered that "some end

users could modify their production processes to use a grade of CMC with a degree of purity or a

granular size that differed from the intended use." (Id.)

In concluding, Defendant ratiocinates that because the ITC's decision to cumulate was

supported by substantial evidence on the record, the ITC "correctly analyzed material injury with

respect to Finland based on the cumulated volumes and price effects of imports from all four

countries." (Id. at 37.) Defendant deduces that the ITC "had no obligation to determine material

injury with respect to subject imports from Finland alone." (Id. at 37-38.) Accordingly,

Defendant submits that the ITC's determination of material must be affirmed. (Id. at 38.)

C.      Defendant-Intervenor's Contentions

In large part, Aqualon's arguments are similar to those set forth by Defendant.

Consequently, this Court will not reiterate such arguments here. It is sufficient to include

Aqualon's summary:

> The [ITC] based its decision to cumulate all subject imports on substantial evidence
> and data found in the questionnaire responses of purchasers, importers, and the
> domestic producer, as well as pricing data collected by the [ITC]'s staff during the
> investigation. These data show that there is reasonable overlap in competition among
> subject countries, with Finland, Mexico, the Netherlands and Sweden, shipping
> substantial percentages of their U.S. exports to purchasers in the oilfield and 'other'
> end-use sectors. This competition includes sales to common customers in at least
> three end-use markets . . . . Additionally a substantial majority of purchasers and
> importers familiar with Finnish product stated that Finnish product is "Always" or
> "Frequently" interchangeable with other subject imports.

(Aqualon Mem. at 2-3.) Aqualon also notes that the ITC found that a number of "large

purchasers [of purified CMC] reported purchases from Finland and at least one other subject

country." (Id. at 8.) Further, Aqualon points out that "the pricing data collected by the [ITC]

staff show substantial volumes of imports in two of the six pricing products from all four

respondent countries." (Id.)

In support of its position, Aqualon identifies several cases in which this court has

affirmed the ITC under similar circumstances. According to Aqualon, "[t]his [c]ourt has upheld

[ITC] determinations, including decisions to cumulate subject imports, based upon on these

questionnaire responses." (Id. at 11-12.) Further, Aqualon asserts that "[t]his [c]ourt has also

upheld [ITC] decisions to cumulate subject imports based on a variety of evidence, including

evidence that subject countries exported the same products identified by the [ITC]'s staff for

pricing comparisons and evidence that customers purchased product from more than one subject

country." (Id. at 12.) Lastly, Aqualon posits that "[t]his [c]ourt has affirmed [ITC]

determinations of competitive overlap where 'there is competition in {the} industry because

other producers also sought to sell that same merchandise to the same customer{.}'" (Id. at 13

(straight brackets added) (citation omitted).)


## JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1581(c) (2000).


## STANDARD OF REVIEW

The court "shall hold unlawful any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law."

Tariff Act of 1930 § 516A(b)(1)(B)(I), as amended, 19 U.S.C. § 1516a(b)(1)(B)(I) (2000).

"Substantial evidence is more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. v.

NLRB, 305 U.S. 197, 229 (1938) (citations omitted). "As long as the agency's methodology and

procedures are reasonable means of effectuating the statutory purpose, and there is substantial

evidence in the record supporting the agency's conclusions, the court will not impose its own

views as to the sufficiency of the agency's investigation or question the agency's methodology."

Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404-05, 636 F. Supp. 961 (1986)

(citations omitted), aff'd, 810 F.2d 1137 (Fed. Cir. 1987).

To determine whether the agency's determination is supported by substantial evidence,

the court must review the record as a whole, "including whatever fairly detracts from the

substantiality of the evidence." Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1562 (Fed. Cir.

1984). Nonetheless, "[t]he Court may not substitute its judgment for that of the administrative

agency," and "the possibility of drawing two inconsistent conclusions from the evidence does not

prevent the agency's finding from being supported by substantial evidence." Barnhart v. U.S.

Treasury Dep't, 9 CIT 287, 290, 613 F. Supp. 370 (1985); see also Universal Camera Corp. v.

NLRB, 340 U.S. 474, 488 (1951). Notwithstanding, the court will not act as a rubberstamp for

the agency's actions and will not give accord to any agency determination "that is based on

inadequate analysis." Chr. Bjelland Seafoods A/S v. United States, 16 CIT 945, 949 (1992). To

be sustained, "the agency must examine the relevant data and articulate a satisfactory explanation

for its action including a rational connection between the facts found and the choice made."

Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43

(1983) (quotation & citation omitted). Thus, if this Court finds that the ITC did not provide a

cogent explanation for its final determination, the Court will set aside that decision. See Id. at

48. In the converse, this Court must sustain a reasoned determination that is supported by the

record before the court. "The court will affirm the determinations of . . . the [ITC] if they are

reasonable and supported by the record as a whole, even where there is evidence which detracts

from the substantiality of the evidence." Chr. Bjelland Seafoods, 16 CIT at 949.


### DISCUSSION

This Court is faced with two questions, one ancillary to other. First, this Court must

decide whether the ITC's decision to cumulate imports of purified CMC from Finland with

imports of the subject merchandise from Sweden, Mexico, and the Netherlands was supported by

substantial evidence on the record. The subsidiary question is whether it was permissible for the

[ITC] not to perform a separate injury determination for imports of purified CMC from Finland.

For the reasons that follow, this Court finds that the ITC's decision to cumulate subject imports

of purified CMC from Finland with imports of the subject merchandise from Sweden, Mexico,

and the Netherlands was supported by substantial evidence on the record and is sustained

accordingly. Thus, it is unnecessary for this Court to reach or rule upon the ancillary question of

whether a separate material injury determination for imports of purified CMC from Finland was

required.

A.        Legal Standard for Mandatory Cumulation

The ITC is required to "cumulatively assess the volume and effect of imports of the

subject merchandise from all countries" for which petitions were filed on the same day, provided

"such imports compete with each other and with domestic like products in the United States

market."  Tariff Act of 1930 § 771(7)(G)(I), 19 U.S.C. § 1677(7)(G)(I) (2000).  "Cumulation was

created as a tool to eliminate inconsistencies in [ITC] practice and to ensure that the injury test

adequately addressed simultaneous unfair imports from different countries."  Steel Auth. of

India, Ltd. v. United States, 25 CIT 472, 476, 146 F. Supp. 2d 900 (2001) (quotation & citation

omitted).  "Cumulation allows the ITC to consider the impact of imports from more than one

country on the domestic industry."  Id. at 474-75 (quotation & citation omitted).  The cumulation

inquiry "recognizes that a domestic industry can be injured by a particular volume of imports and

their effects regardless of whether those imports come from one source or many sources."  Id. at

475 (quotation & citation omitted).

To determine whether the subject imports compete with each other and with domestic

like product, the ITC has adopted four factors, the use of which this court has endorsed:

(1)      the degree of fungibility between the imports from different countries and
         the domestic like product, including consideration of specific customer
         requirements and other related questions;
(2)      the presence of sales or offers to sell in the same geographical markets of imports
         from different countries and the domestic like product;
(3)      the existence of common or similar channels of distribution for imports from
         different countries and the domestic like product; and
(4)      whether the imports are simultaneously present in the market.

Mukand Ltd. v. United States, 20 CIT 903, 907, 937 F. Supp. 910 (1996); see also Steel Auth. of

India, 25 CIT at 475; Wieland Werke, AG v. United States, 13 CIT 561, 563, 718 F. Supp. 50

(1989); Fundicao Tupy S.A. v. United States, 12 CIT 6, 10-11, 678 F. Supp. 898 (1988).

Plaintiffs do not challenge the ITC findings with regard to the latter three factors. Instead,

Plaintiffs takes issue with the ITC fungibility analysis.

None of the cumulation factors is determinative, and the list is not exhaustive. See e.g.,

Wieland Werke, 13 CIT at 563; Steel Auth. of India, 25 CIT at 475. "Completely overlapping

markets are not required." Wieland Werke, 13 CIT at 563. Rather, to support cumulation, the

ITC must find a "reasonable overlap of competition" between imports from the subject countries

and the domestic like product. Goss Graphics Sys., Inc. v. United States, 22 CIT 983, 984, 33 F.

Supp. 2d 1082 (1998), aff'd 216 F.3d 1357 (Fed. Cir. 2000) (quotation & citation omitted);

Wieland Werke, 13 CIT at 563; Steel Auth. of India, 25 CIT at 475; Mukand, 20 CIT at 909. It

follows that the ITC also "need only find a reasonable overlap of fungibility to support its

competition finding." Mukand, 20 CIT at 909.

B.      Fungibility:  Substantial Evidence on the Record

In deciding whether to cumulate imports of purified CMC from the subject countries, the

ITC considered the four factors that indicate overlap of competition: 1) fungibility, 2) sales or

offers to sell in overlapping geographic markets,[6] 3) common or similar channels of distribution,[7]

---

[6]The ITC determined that the "market for purified CMC is a nationwide one[,] and domestic and subject merchandise are sold and shipped throughout the market on a nationwide basis." Id. Thus, the ITC found that "the domestic products and the subject imports were sold in the same geographic regions during the period of investigation." Id.

[7]ITC-gathered data indicated "that the large majority of subject imports and the domestic merchandise were [sic] sold to end users during the POI." Id. Accordingly, the ITC found "that the subject and domestic merchandise shared similar channels of distribution during the POI."

and 4) simultaneous presence in the market.[8]  Only the ITC's finding with regard to fungibility is

at issue in this case.

The data collected by the ITC indicate that there is "substitutability in demand between

the purified CMC produced domestically and that imported from the subject countries, but some

reported product differentiation and other differences may limit the degree of this demand

substitution."  Final Report at II-18.  Not surprisingly, Aqualon reported "that the basic purified

CMC chemical is fungible; that the U.S. customers often request bids from the domestic

producer and several of the subject importers; and that the U.S.-produced and subject imported

purified CMC products are sold in the same channels of distribution."  Id.  On the other hand,

Plaintiffs reported "that there is virtually no competition" between purified CMC from Finland

and domestic purified CMC and that there is no reasonable overlap of competition between

purified CMC from Finland and domestic purified CMC.  Id. at II-18–19.

In the process of gathering data for the investigation, the ITC

> sent questionnaires to 78 firms believed to be importers from Finland, Mexico, [the] Netherlands, Sweden, and nonsubject sources of purified CMC . . . .  Questionnaire responses were received from 32 companies, including from the vast majority of importers from Finland, Mexico, the Netherlands, and Sweden. . . .  While 21 firms reported imports from the subject countries during January 2002–December 2004, 7 firms accounted form almost 85 percent of imports of purified CMC from subject sources during 2004.

---

Id.

[8]The ITC ascertained that both the subject imports and domestic product "were present in substantial volumes in the U.S. market during each year of the POI."  Final Report at 12. Correspondingly, the ITC found "that all of the subject imports and the domestic merchandise were simultaneously present in the market during the POI."  Id.

Id. at IV-1.  "The large majority of market participants report[ed] there is a relatively high degree

of interchangeability among the imports from the four subject countries and the domestic like

product."  Id. at 9.  Based upon these questionnaire responses, the ITC found "that there is a

reasonably high degree of fungibility among the subject and domestic merchandise."  Id. at 10.

Specifically, the ITC received responses from Aqualon, twenty-six of thirty-five importers, and

forty-three of fifty-nine purchasers that the domestic product and the subject imports were always

or frequently interchangeable.  Id. at 9-10.  Likewise, Aqualon, twenty-seven of thirty-five

importers, and thirty of forty-one purchasers responded that the subject imports were always or

frequently interchangeable with each other.  Id. at 10.  "Finally, most purchasers rated the

domestic and subject merchandise as being comparable to each other on nearly all of the factors

that affected their purchasing decisions during the period [of review]."  Id.

It is these results that Plaintiffs question.  However, in the Final Results, the ITC

recognized and addressed Plaintiffs concerns.  The ITC acknowledged "that the record data on

end use shipments indicates that the large majority of Finnish imports were sold into sectors of

the market where the other subject countries had a more limited presence, that is, the paper and

board and oilfield sectors."  Id.  Nonetheless, after considering the end use shipment data

together with other record data, the ITC concluded that there was more than a minimal level of

fungibility between Finnish imports and imports of purified CMC from the other subject

countries during the POI.  Id.

To support its conclusion, the ITC noted "that suppliers of purified CMC from the four

subject countries were able to supply purified CMC product into certain end use sectors of the

market as demand required." Id. As an example, the data show that during different points in the

POI each of the four subject countries shipped "substantial percentages of their total shipments

into the oilfield sector" to meet demand in the area. Id. In addition, the four subject countries

supplied purified CMC to the "other uses" segment during the POI. Id. at 10-11. The Final

Report also identifies several large purchasers that purchased "subject imports from both Finland

and one or more of the other three subject countries during the [POI]." Id. at 11. In addition, the

ITC determined that "imports from Finland were present in three of five end-use segments." Id.

at IV-3. Based upon this information, the ITC found "that the record establish[ed] that there was

a reasonable degree of competitive overlap between the imports from Finland and the other

subject countries." Id. at 11.

Next, the Final Report states that "the physical differences between the purified CMC

sold into the major end use sectors of the market are not generally substantial, especially for

grades sold into the non-regulated (i.e., paper and board, oilfield, and other uses) sectors of the

market." Id. The ITC relied upon witnesses who testified that "the differences between the

various grades [of purified CMC] sold into the different end use sectors are not particularly

significant from either a chemical or production standpoint." Id. The ITC also looked to data

Aqualon provided that suggested that many purified CMC "products within individual families

are sold into both regulated (i.e., food and personal care products) and non-regulated (oilfield,

paper, and other) sectors of the market." Id. Lastly, the ITC determined that "end users may be

able to modify their production processes to use a grade with a different degree of purity or a

different granular size for their intended end use."[9]  Id.  After considering all the data, the ITC

concluded that differences in end uses were not significant and found that "there was a

reasonable level of fungibility between the Finnish imports and the other subject imports during

the [POI]."  Id.

This Court has previously noted that "[d]ecisions as to the comparability of products are

very fact specific."  Iwatsu Elec. Co., Ltd. v. United States, 15 CIT 44, 57, 758 F. Supp. 1506

(1991).  "Often, there may be substantial evidence on the record to support several inconsistent

conclusions."  BIC Corp. v. United States, 21 CIT 448, 457, 964 F. Supp. 391 (1997).  In its role

as fact-finder, the ITC has wide latitude in reaching its decisions.  Id.

It is not for this Court to upset the factual findings and legal conclusions of the ITC unless

such are unsupported by substantial evidence on the record or otherwise not in accordance with

law.  Even if this Court would find that another outcome were better-supported by the record,

this Court is without discretion to reject a reasoned, well-supported finding by the agency.

Although Plaintiffs would have analyzed the data differently, there is no evidence on the

record to suggest that the ITC failed to consider the record as a whole, though it placed more

emphasis on some elements at the expense of others.  "The [ITC]'s decision does not depend on

---

[9]This Court is reluctant to give much weight to the speculative ability of end users to adapt their production processes as a reliable factor tending indicate the interchangeability of imported Finnish product with other subject and domestic purified CMC.  Although the ITC questionnaires seemingly did not define "interchangeable," this Court notes that the term means "[c]apable of being put or used in the place of each other."  VII Oxford English Dictionary 1090 (2d ed., J. A. Simpson & E. S. C. Weiner eds., Clarendon Press 1989).  If alterations to the production process are necessary to allow use of one product in place of other, then this Court does not consider that the two goods are necessarily interchangeable.  Because this fact is not critical to the ITC's ultimate finding of fungibility, the possible error need not be explored further and does not affect the outcome of this case.

the 'weight' of the evidence, but rather on the expert judgment of the [ITC] based on the evidence of record." Matsushita Elec. Indus. Co., Ltd. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984). "The ITC, as the trier of fact, weighs the evidence in the record and is entitled to accord more weight to the evidence it finds most probative to the question at issue." Altx, Inc. v. United States, 26 CIT 1425, 1434 (2002), aff'd 370 F.3d 1108 (Fed. Cir. 2004). Further, there is substantial evidence on the record that not only were the subject imports from Finland fungible with the domestic product and other subject imports but also that the other three cumulation factors were satisfied.[10] Accordingly, this Court affirms the ITC's use of cumulation in its material injury analysis because there is sufficient evidence on the record as a whole of a reasonable overlap in competition between Finnish and other subject imports of purified CMC and as between Finnish imports of purified CMC and domestic like product.

---

[10]This Court notes that Plaintiffs did not challenge the positive findings by the ITC on the other three cumulation factors. Even were this Court to have rejected the ITC's fungibility analysis, there appears to be substantial evidence on the record to support a cumulation determination. Because fungibility is not a determinative factor in finding that cumulation is required, the ITC's fungibility analysis might well be moot. Cf. BIC, 21 CIT at 456 ("Fungibility is only one of four factors that the [ITC] considers when it decides whether a reasonable overlap of competition exists. . . . In this case, the [ITC] decided to cumulate despite its findings that the subject imports and the domestic product were only 'somewhat fungible.'").

## CONCLUSION

For the reasons cited herein, this Court denies Plaintiffs' Motion for Judgment on the

Agency Record and sustains the ITC's final injury determination.  Judgment will enter for

Defendant accordingly.


/s/        Gregory W. Carman

Gregory W. Carman


Dated:  September 12, 2006
          New York, New York